IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JESSICA GARCIA SHAFER and DONA KIM MURPHEY,<br>　　*Plaintiffs*,<br><br>v.<br><br>PEARLAND INDEPENDENT SCHOOL DISTRICT,<br>　　*Defendant.* | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | CIVIL ACTION NO. 3:22-cv-00387 |

## DEFENDANT PEARLAND INDEPENDENT SCHOOL DISTRICT'S
## MOTION FOR FINAL SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

Table of Authorities ..................................................................................................................iii

Nature and Stage of Proceeding.............................................................................................1

Issues Presented.......................................................................................................................1

Legal Standards Governing Vote Dilution Claims ..............................................................2

      I.     The Equal Protection Clause of the Fourteenth Amendment............................2

            A.     Discriminatory Purpose ...................................................................................3

            B.     Discriminatory Effect.......................................................................................4

      II.    Section 2 of the Voting Rights Act .........................................................................5

            A.     *Gingles I* ...........................................................................................................6

            B.     *Gingles II*..........................................................................................................7

            C.     *Gingles III* .........................................................................................................8

            D.     Totality of the Circumstances/Senate Factors...........................................8

Undisputed Facts......................................................................................................................10

      I.     General Background ...................................................................................................10

      II.    Pearland ISD's At-Large Election System ............................................................11

      III.   Pearland ISD's Student Achievement ....................................................................12

      IV.   Plaintiffs' Demonstration Districts .........................................................................13

Argument and Authorities ......................................................................................................14

      I.     Plaintiffs' Section 2 Claims indisputably fail under *Petteway* ..............................14

      II.    The Fifteenth Amendment does not apply to plaintiffs' vote dilution claims ...................................................................................................................16

      III.   Plaintiffs cannot establish a Fourteenth Amendment violation based on a coalition theory of liability.................................................................17

      IV.   Plaintiffs' illustrative plan subordinates traditional districting principles and allows race to predominate.........................................................22

            A.     Attendance Zones..............................................................................................24

            B.     School Locations...............................................................................................25

            C.     Neighborhoods .................................................................................................26

            D.     Social and Economic Characteristics .........................................................27

Conclusion.................................................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Abrams v. Johnson*,
 521 U.S. 74 (1997)................................................................................................7

*Allen v. Milligan*,
 599 U.S. 1 (2023)................................................................................................19

*Arlington Heights v. Metro. Housing Dev. Corp.*,
 429 U.S. 242 (1977).........................................................................................3, 5

*Bartlett v. Strickland*,
 556 U.S. 1 (2009)................................................................................15, 19, 28

*Bethune-Hill v. Virginia St. Bd. of Elections*,
 580 U.S. 178 (2017)..................................................................................... 19, 20

*Callais v. Landry*,
 2024 WL 1903930 (W.D. La. Apr. 30, 2024) ....................................................20

*Campos v. City of Baytown*,
 840 F.2d 1240 (5th Cir. 1988) ("*Campos I*")................................................ 14, 15

*Campos v. City of Baytown*,
 849 F.2d 943 (5th Cir. 1988) ("*Campos II*") ......................................................19

*Cano v. Davis*,
 211 F. Supp. 3d 1208 (C.D. Cal. 2002), *aff'd*, 537 U.S. 1100 (2003)...............5

*City of Mobile v. Bolden*,
 446 U.S. 55 (1980)................................................... 1, 2, 5, 16, 17, 18

*Cooper v. Harris*,
 581 U.S. 285 (2017)..................................................................................... 19, 20

*Corey v. Airport Svcs., Inc. v. Clear Channel Outdoor, Inc.*,
 682 F.3d 1293 (11th Cir. 2012) ..........................................................................18

*Fairley v. Hattiesburg, Miss.*,
 584 F.3d 660 (5th Cir. 2009)............................................................................6, 7

*Fisher v. Univ. of Tex. at Austin*,
 570 U.S. 297 (2013)............................................................................................20

*Gonzalez v. Harris Cnty., Tex.*,
601 Fed. App'x 255 (5th Cir. 2015) ................................................................................22

*Gruter v. Bollinger*,
539 U.S. 306 (2003) ..........................................................................................................20

*Hardin v. Cnty. of Dallas, Tex.*,
948 F.3d 302 (5th Cir. 2020) ..............................................................................................4

*Johnson v. DeGrandy*,
512 U.S. 997 (1994) .............................................................................................................6

*Johnson v. DeSoto Cnty. Bd. of Comm'rs*,
204 F.3d 1335 (11th Cir. 2000) ........................................................................................21

*Kumar v. Frisco Indep. Sch. Dist.*,
476 F. Supp. 3d 439 (E.D. Tex. 2020) .........................................................................7, 23

*Lopez v. City of Houston*,
2009 WL 1456487 (S.D. Tex. 2009), *aff'd*, 617 F.3d 336 (5th Cir. 2010) ............... 17, 21

*LULAC v. Abbott*,
601 F. Supp. 3d 147 (W.D. Tex. 2022) ..............................................................................5

*LULAC v. Clements*,
986 F.2d 728 (5th Cir. 1993) ("*Clements I*") ..................................................................7, 8

*LULAC v. Clements*,
999 F.2d 831 (5th Cir. 1993) ("*Clements II*") ................................................................8, 28

*LULAC v. Perry*,
548 U.S. 399 (2006) ........................................................................................................7, 22

*Martinez v. Bush*,
234 F. Supp. 2d 1275 (S.D. Fla. 2002) ...........................................................................4, 5

*McCleskey v. Kemp*,
481 U.S. 279 (1987) ..............................................................................................................3

*Miller v. Johnson*,
515 U.S. 900 (1995) ...........................................................................................................20

*NAACP v. City of Opelika*,
748 F.2d 1473 (11th Cir. 1984) ........................................................................................21

*Nixon v. Kent Cnty.*,
 76 F.3d 1381 (6th Cir. 1996) (en banc) ................................................................ 20, 21

*Nordlinger v. Hahn*,
 505 U.S. 1 (1992) ..........................................................................................................18

*Perez v. Abbott*,
 253 F. Supp. 3d 864 (W.D. Tex. 2017) ..................................................................... 1, 2, 4

*Perez v. Pasadena Indep. Sch. Dist.*,
 958 F. Supp. 1196 (S.D. Tex. 1997), *aff'd*, 156 F.3d 368 (5th Cir. 1999) .............. 6, 7, 19

*Perez v. Pasadena Indep. Sch. Dist.*,
 165 F.3d 368 (5th Cir. 1999) .......................................................................................6, 7

*Personnel Adm'r of Mass. v. Feeney*,
 442 U.S. 256 (1979) .....................................................................................................3, 4

*Petteway v. Galveston Cnty.*,
 698 F. Supp. 3d 952 (S.D. Tex. 2023) ...........................................................................14

*Petteway v. Galveston Cnty, Tex.*,
 86 F.4th 214 (5th Cir. 2023) ..........................................................................................15

*Petteway v. Galveston Cnty, Tex.*,
 111 F.4th 596 (5th Cir. 2024) (en banc) .................................................. 1, 7, 15, 19, 21, 22

*Prejean v. Foster*,
 227 F.3d 504 (5th Cir. 2000) ..........................................................................................16

*Reno v. Bossier Parish Sch. Bd.*,
 520 U.S. 471 (1997) ("*Reno I*") .........................................................................3, 17, 21, 22

*Reno v. Bossier Parish Sch. Bd.*,
 528 U.S. 320 (2000) ("*Reno II*") ..................................................................................1, 16

*Rodriguez v. Harris Cnty., Tex.*,
 964 F. Supp. 2d 686 (S.D. Tex. 2013) .............................................................................2

*Rogers v. Lodge*,
 458 U.S. 613 (1982) ........................................................................................................2, 3

*Rollins v. Fort Bend Indep. Sch. Dist.*,
 89 F.3d 1205 (5th Cir. 1996) ...........................................................................................6, 8

*Rucho v. Common Cause*,
    588 U.S. 684 (2019)..................................................................................... 17, 18

*Sensley v. Albritton*,
    385 F.3d 591 (5th Cir. 2004)........................................................................ 6, 7, 8, 9

*Shaw v. Hunt*,
    517 U.S. 899 (1996)...........................................................................................19

*Shelby Cnty. v. Holder*,
    570 U.S. 529 (2013).............................................................................................3

*Texas Entertainment Assoc., Inc. v. Hegar*,
    10 F.4th 495 (5th Cir. 2021) ..............................................................................18

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)...............................................................................................6

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016)........................................................................ 3, 5, 14

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004)................................................................................. 17, 18, 19

*Voinovich v. Quilter*,
    507 U.S. 146 (1993)...........................................................................................20

*Voter Info. Project, Inc. v. City of Baton Rouge*,
    612 F.2d 208 (5th Cir. 1980)................................................................................2

*Washington v. Finlay*,
    664 F.2d 913 (4th Cir. 1981)..............................................................................16

*White v. Register*,
    412 U.S. 755 (1973)..................................................................................... 2, 4, 5

## Constitutional Provisions

U.S. CONST. amend. XIV, § 1...............................................................................2, 17, 20

U.S. CONST. Amend. XV, § 1................................................................................. 1, 206

## **Statutes**

52 U.S.C. § 10301(a)............................................................................................................5

52 U.S.C. § 10301(b) .......................................................................................................5, 6

TEX. EDUC. CODE § 11.052.................................................................................................11

## **Other Sources**

S. Rep. No. 417, 97th Cong., 2d Sess. 28–29, *reprinted in* 1982 U.S. Code Cong.
        & Ad. News 177...................................................................................................9

**DEFENDANT PEARLAD INDPENDENT SCHOOL DISTRICT'S
MOTION FOR FINAL SUMMARY JUDGMENT**

Defendant Pearland Independent School District ("Pearland ISD" or the "District")

moves for final summary judgment on all claims asserted by plaintiffs Jessica Garcia Shafer

and Dona Kim Murphey, as follows:

### NATURE AND STAGE OF PROCEEDING

Jessica Garcia Shafer (Hispanic) and Dona Kim Murphey (Asian) unsuccessfully ran

for positions on Pearland ISD's Board of Trustees. They now challenge the District's at-large

system of electing its Board members, claiming that it dilutes the collective voting strength of

Hispanic, Asian, and African American voters in violation of Section 2 of the Voting Rights

Act and the Fourteenth and Fifteenth Amendments to the United States Constitution. [Dkt.

No. 1, ¶¶ 54–66]. The District now moves for judgment as a matter of law.[1]

### ISSUES PRESENTED

1. In *Petteway v. Galveston County*, 111 F.4th 596 (5th Cir. 2024) (en banc), the Fifth Circuit rejected the viability of coalition-based vote dilution claims under Section 2 of the Voting Right Act, holding that Section 2 does not protect "distinct minority groups that share political preferences but lack the cementing force of race or ethnicity." *Id.* at 614. Given that plaintiffs' Section 2 claims rely on a coalition of Hispanic, Asian, and African American voters, should the Court grant judgment in favor of the District?

2. The United States Supreme Court has expressly rejected the notion that the Fifteenth Amendment applies to vote dilution claims. *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000). Do plaintiffs' Fifteenth Amendment claims fail as a matter of law?

3. "To prove intentional vote dilution under the Fourteenth Amendment, plaintiffs must show both discriminatory purpose and discriminatory effect." *Perez v. Abbott*, 253 F. Supp. 3d 864, 941 (W.D. Tex. 2017) (citing *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980)). Can plaintiffs prove that they have been denied equal protection, or that they are entitled to relief, when their claims are premised on a coalition theory of liability?

---

[1]The Court previously dismissed plaintiffs' official capacity claims against the District's Trustees. [Dkt. No. 29].

<u>**LEGAL STANDARDS GOVERNING VOTE DILUTION CLAIMS**</u>

Because vote dilution cases present complex factual and legal issues, the District will begin by discussing the standards that must guide the Court's analysis.

## I.    The Equal Protection Clause of the Fourteenth Amendment

The Fourteenth Amendment prohibits the state from denying "any person" within its jurisdiction "the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.[2]  In the voting rights context, the United States Supreme Court has repeatedly held that at-large election systems "are not per se unconstitutional." *Rogers v. Lodge*, 458 U.S. 613, 616–17 (1982); *White v. Register*, 412 U.S. 755, 765 (1973).  Instead, to prevail on a vote dilution claim under the Equal Protection Clause, plaintiffs must have "[p]roof that the disputed plan was conceived or operated as a purposeful device to further racial discrimination by minimizing, cancelling out, or diluting the voting strength of racial elements in the voting population." *Perez v. Abbott*, 253 F. Supp. 3d 864, 941 (W.D. Tex. 2017) (citing *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980)); *see also Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 800 (S.D. Tex. 2013) ("To obtain relief on a constitutional vote dilution claim [], the plaintiffs must 'prove that the purpose and operative effect' of the challenged election scheme 'is to dilute the voting strength of [minority] citizens.'") (quoting *Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 212 (5th Cir. 1980)).  Succinctly stated, "[t]o prove intentional vote dilution under the Fourteenth Amendment, plaintiffs must show both discriminatory purpose and discriminatory effect." *Perez*, 253 F. Supp. 3d at 942.

---

[2]Plaintiffs purport to bring constitutional vote dilution claims under both the Fourteenth and Fifteenth Amendments.  As explained below, the Fifteenth Amendment does not apply in this context.

### A.    Discriminatory Purpose

The Supreme Court considered how to assess a political body's intent in the voting rights context in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 242 (1977). "The important starting point for assessing discriminatory intent under *Arlington Heights* is the impact of the official action whether it bears more heavily on one race than another." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 489 (1997) ("*Reno I*") (citations and quotations omitted); *but see Rogers*, 458 U.S. at 618 (noting that Supreme Court precedent "rejected the notion that a law is invalid under the Equal Protection Clause simply because it may affect a greater population of one race than another"). "Other considerations relevant to the purpose inquiry include, among other things, the historical background of the jurisdiction's decision; the specific sequence of events leading up to the challenged decision; departures from the normal procedural sequence; and the legislative or administrative history, especially any contemporary statements by members of the decisionmaking body."[3]  *Reno I*, 520 U.S. at 489 (cleaned up); *see also Rogers*, 458 U.S. at 618 (holding that "discriminatory purpose may often be inferred from the totality of the relevant facts").

Importantly, "awareness of a disparate impact on a protected group is not enough." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016).  Instead, a plaintiff must show that the challenged election system was enacted or maintained "*because of that* disparate impact."  *Id.* This is because discriminatory purpose "implies more than intent as volition or intent as

---

[3]At the same time, the Supreme Court has cautioned that "unless historical evidence is reasonably contemporaneous with the challenged action, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987); *see also Shelby Cnty. v. Holder*, 570 U.S. 529, 535–36 & 552 (2013) (counseling against undue reliance on noncontemporary evidence of discrimination in the voting rights context,  and noting that "history did not end in 1965").

awareness of consequences.  It implies that the decisionmaker [] selected or reaffirmed a particular course of action as least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

**B.     Discriminatory Effect**

Even assuming the existence of a discriminatory purpose, a vote dilution plaintiff still cannot prevail under the Fourteenth Amendment unless they can show that the challenged voting practice has a discriminatory effect on minority voters:

> To sustain [constitutional challenges to at-large districts], it is not enough that the [minority] group allegedly discriminated against has not had legislative seats in proportion to its voting population.  The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question— that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.

*White*, 412 U.S. at 765–66.

Courts have taken varying approaches when deciding the type of proof required to establish that a discriminatory purpose has resulted in dilutive effects.  *See, e.g., Hardin v. Cnty. of Dallas, Tex.*, 948 F.3d 302, 313 (5th Cir. 2020) (noting that the appropriate framework for intentional vote dilution claims is "somewhat unsettled").  Some courts have held that, at a minimum, a plaintiff must show that the minority group at issue is politically cohesive, and that its preferred candidate is usually defeated due to racial bloc voting.  *Perez*, 253 F. Supp. 3d at 942–44 (citing cases); *see also Martinez v. Bush*, 234 F. Supp. 2d 1275, 1326 (S.D. Fla. 2002) ("[E]ven though *Gingles* did not involve an equal protection claim, the three factors were derived by the Court from the principles set forth in the vote dilution cases brought under the Equal Protection Clause.  We therefore conclude that the three preconditions have always

been and remain elements of constitutional vote dilution claims.");[4] *Cano v. Davis*, 211 F. Supp. 3d 1208, 1248–50 (C.D. Cal. 2002), *aff'd*, 537 U.S. 1100 (2003) (holding that, in cases of intentional vote dilution, plaintiffs "must still show a practical effect on the minority group's ability to elect representatives of choice," and that the "irreducible minimum" showing would be that a minority groups preferences are regularly defeated by a non-minority bloc of voters). Meanwhile, other courts have held that a plaintiff must instead show that the complained-of practice "bears more heavily on one race than another." *LULAC v. Abbott*, 601 F. Supp. 3d 147, 164 (W.D. Tex. 2022) (quoting *Arlington Heights*, 429 U.S. at 266).

## II.    Section 2 of the Voting Rights Act

Because discriminatory intent is difficult to prove, most modern vote dilution claims are brought under Section 2 of the Voting Rights Act, which utilizes an "easier-to-prove" disparate impact standard. *See Veasey*, 830 F.3d at 335 n.15 (Costa, J., dissenting) (noting the drop in intentional discrimination claims following the 1982 amendments to the Voting Rights Act).[5]  Section 2 prohibits voting procedures that "result[] in a denial or abridgment of the right of any citizen of the United States to vote on account of race[.]"  52 U.S.C. § 10301(a). A Section 2 violation occurs if, "based on the totality of the circumstances," voting procedures "are not equally open to participation by" members of a minority group, or if such members "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b).  "The extent to which

---

[4]The *Gingles* preconditions are discussed below.

[5]In 1980, a plurality of the Supreme Court held that a claimed Voting Rights Act violation required proof of discriminatory intent. *Bolden*, 446 U.S. at 62–65.  Congress responded in 1982 by amending Section 2 to specifically prohibit practices and procedures that *result* in the denial or abridgement of the right to vote, thereby codifying the "results test" articulated in *White v. Register*, 412 U.S. 755 (1973).

members of a protected class have been elected to office . . . is one circumstance which may

be considered; *Provided*, That nothing in [the Voting Rights Act] establishes a right to have

members of a protected class elected in numbers equal to their proportion in the population."

*Id.* (emphasis original).

When evaluating a Section 2 vote dilution claim, courts apply the two-part framework

set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986):

> First, plaintiffs must satisfy, as a threshold matter, three preconditions. Specifically, the minority group must demonstrate that: (1) it is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances[6]—usually to defeat the minority's preferred candidates. Failure to establish all three of these elements defeats a Section 2 claim. Second, if the preconditions are proved, plaintiff must then prove that based on the totality of the circumstances, they have less opportunity than other members of the electorate to participate in the electoral process and to elect representatives of their choice.

*Sensley v. Albritton*, 385 F.3d 591, 595 (5th Cir. 2004) (cleaned up).

### A.    *Gingles I*

To prove the first *Gingles* precondition, plaintiffs must demonstrate "the possibility of

creating more than the existing number of reasonably compact districts with a sufficiently large

minority population to elect candidates of its choice." *Johnson v. DeGrandy*, 512 U.S. 997, 1008

(1994); *Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 667–68 (5th Cir. 2009).  "To satisfy this

requirement, a plaintiff must demonstrate that it is possible to draw an election district of an

appropriate size and shape where the citizen voting age population of the minority group is

---

[6]"The *Gingles* Court noted that the success of a minority candidate does not automatically disprove the existence of white bloc voting" and "listed several alternative explanations or 'special circumstances' that '*may* explain minority electrical success in a polarized contest:' (1) the absence of an opponent, (2) incumbency, or (3) utilization of bullet voting."  *Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1212 (5th Cir. 1996) (quoting *Gingles*, 478 U.S. at 56).

the majority." *Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999); *see also Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 492 (E.D. Tex. 2020) ("In submitting an illustrative district, a plaintiff must prove that the minority citizen age voting population ("MCVAP") of the illustrative district exceeds 50% of the total CVAP within the district."). In other words, a vote dilution plaintiff must be able to draw an appropriate majority-minority demonstration district, and must do so using one distinct minority group. *Petteway v. Galveston Cnty.*, 111 F.4th 596, 614 (5th Cir. 2024) (holding that Section 2 plaintiffs cannot combine different minority groups to satisfy *Gingles I*).

Additionally, the proposed districting scheme must be "consistent with traditional districting principles such as compactness, contiguity, maintaining communities of interest, and respect for incumbency." *Fairley*, 584 at 668 (citing *Sensley*, 385 F.3d at 597–98). This requirement ensures that a proposed plan does not "allow[] race to predominate." *Abrams v. Johnson*, 521 U.S. 74, 91 (1997). Indeed, any failure to comply with traditional districting principles puts a political body (or a court) at risk of improperly assuming "from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls." *LULAC v. Perry*, 548 U.S. 399, 433 (2006) (cleaned up); *see also Kumar*, 476 F. Supp. 3d at 494 ("Failure to be mindful of such prohibited assumptions lends a real risk to diseasing what is otherwise meant to be a process that seeks to prevent discrimination.")

## B. *Gingles II*

To prove the second *Gingles* precondition, "a plaintiff must demonstrate that the minority group he or she is espousing is 'politically cohesive.'" *Kumar*, 476 F. Supp. 3d at 502 (citing *LULAC v. Clements*, 986 F.2d 728, 743 (5th Cir. 1993) ("*Clements I*")). Notably,

7

"[p]olitical cohesiveness is related to, but distinct from, the concept of racially polarized voting. The notion of political cohesiveness contemplates that a specified group of voters shares common beliefs, ideals, principles, agendas, concerns, and the like such that they generally united behind or coalesce around particular candidates and issues." *Clements I*, 986 F.2d at 744. On the other hand, racially polarized voting "describes an electorate in which white voters favor and vote for certain candidates or propositions, and minority voters vote for other candidates or propositions." *Id.* Because racially polarized voting does not, in and of itself, demonstrate that minority groups are themselves united behind a particular candidate or issue, evidence of racially polarized voting does not "automatically establish minority voting cohesiveness." *Id.* at n.5.

### C.   *Gingles III*

To prove the third and final *Gingles* precondition, a plaintiff must demonstrate that "the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate," absent special circumstances. *LULAC v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993) ("*Clements II*"); *see also Rollins*, 89 F.3d at 1212 (noting that the "special circumstances inquiry" is "an essential part of the *Gingles III* requirement). "[T]he question here is not whether white residents tend to vote as a bloc, but whether such bloc voting is 'legally significant.'" *Clements II*, 999 F.2d at 849 (citing *Gingles*, 478 U.S. at 55).

### D.   Totality of the Circumstances/Senate Factors

If (and only if) a Section 2 plaintiff can satisfy all three *Gingles* threshold factors, the "plaintiff must then prove that based on the totality of the circumstances, they have less opportunity than other members of the electorate to participate in the electoral process and

to elect representatives of their choice." *Sensley* 385 F.3d at 595. In connection with the 1982 amendments to the Voting Rights Act, the Senate Committee on the Judiciary identified the following "typical factors" relevant to the totality of the circumstances analysis:

(i)      the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(ii)     the extent to which voting in the elections of the state or political subdivision is racially polarized;

(iii)    the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(iv)     if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(v)      the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(vi)     whether political campaigns have been characterized by overt or subtle racial appeals; and

(vii)    the extent to which members of the minority group have been elected to public office in the jurisdiction.

S. Rep. No. 417, 97th Cong., 2d Sess. 28–29, *reprinted in* 1982 U.S. Code Cong. & Ad. News 177, 206–07.

The Senate Committee also identified the following factors as having probative value in certain cases, including (i) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (ii) whether the policy underlying the challenged voting practice or procedure is tenuous. *Id.*

9

**UNDISPUTED FACTS**

**I.    General Background**

Pearland ISD was established as an independent public school district in 1937.  [Exh. 1, Decl. of Dr. Larry Berger, ¶ 3].  Dr. Larry Berger currently serves as the District's Superintendent.  [*Id.* at ¶¶ 1, 3].  Dr. Berger reports to the District's seven-member Board of Trustees.

Pearland ISD educates approximately 21,000 students, employs more than 2,700 full-time employees, and has twenty-three total campuses—eleven elementary schools, four middle schools, four junior high schools, three high schools, and two schools of choice.  [Exh. 1, ¶ 10; *see also* https://www.pearlandisd.org/about-us/our-district/our-district (last visited Sept. 24, 2024)].[7]

According to the Texas Education Agency's 2021–2022 Texas Academic Performance Report (TAPR) for Pearland ISD, the District's student population during the 2021–2022 school year was 14.6% African American, 37.4% Hispanic, 32.4% White, 11.3% Asian, 0.2% American Indian, 0.1% Pacific Islander, and 3.9% two or more races.  [Exh. 2 at PEARLAND ISD_VRA 00247].  Meanwhile, the American Community Survey 2017–2021 5-Year Data Release reflects that the District's CVAP is 22.3% Hispanic, 51.2% White, 18.0% African American, 7.4% Asian, and 1.1% "All Other."  [*See* Dkt. No. 36, p. 12; Dkt. No. 49-1, p. 30].

---

[7]Robert Turner College & Career High School and the PACE Center are "schools of choice" because student are not "zoned" to them, but can apply to attend.  *See* https://tcchs.pearlandisd.org/news/news-details/~board/robert-turner-college-career-high-school-news/post/recruitment-and-enrollment (last visited Sept. 24, 2024); https://pace.pearlandisd.org/ace/about-ace (last visited Sept. 24, 2024).  The District also operates its Disciplinary Alternative Education Program (DAEP) at the PACE Center.  DAEP campuses are not rated by TEA.  *See* TEXAS EDUCATION AGENCY, 2022 Accountability Manual: Chapter 7 – Other Accountability System Processes, *available at* https://tea.texas.gov/texas-schools/accountability/academic-accountability/performance-reporting/chapter-7-2022-other-accountability-system-processes.pdf.

10

**II.    Pearland ISD's At-Large Election System**

The District has always elected the members of its Board of Trustees on a districtwide basis (*i.e.*, "at-large").  [Exh. 1, ¶ 5].  The District conducts Board elections each May, and Trustees are elected by position to serve staggered three-year terms, based on a plurality of the vote.  [*Id.* at ¶ 3].

At-large school board elections are not unique to Pearland ISD because, absent the creation of single-member districts pursuant to section 11.052 of the Texas Education Code, elections for school board trustees are, by default, at-large.  *See* TEX. EDUC. CODE § 11.052.  Additionally, there are non-race-based policy reasons for electing school board trustees on an at-large basis.  For example, at-large electoral systems can promote the election of trustees who are subject to the will of *all* voters in the school district (and who must therefore have the interest of *all* school district constituents at heart), whereas single-member districts can promote the balkanization of a school district by electing trustees who are only focused on the interests of their geographic areas (as opposed to the overall bests interests of the entire school district).  [Exh. 1, ¶ 6].

Although Pearland ISD's current Trustees are Anglo, people of color have served on the Board in the past.  For example, Charles Gooden, Jr. (African American) served on the Board from 2014 to 2020.  [Exh. 1, ¶ 7].  In 2014, Mr. Gooden ran against two Anglo candidates and prevailed with 54.5% of the vote.  [*Id.*].  In 2017, Mr. Gooden ran unopposed.  [*Id.*].  And, while Mr. Gooden lost reelection in 2020, the Plaintiffs in this case—Jessica Garcia Shafer (Hispanic) and Dona Kim Murphey (Asian)—openly supported Mr. Gooden's Anglo opponent, who successfully unseated Mr. Gooden as the incumbent Board President.  [Exh.

11

3 at Interrogatory No. 20; *see also* Exh. 4]. In other words, plaintiffs' candidate of choice was elected in 2020, and that candidate remains on the Board to this day. [*Id.*].

Additionally, Florida Dotson (African American) served on the Board from 2006 to 2009, and Mikael Ilahi Floyd (Asian) defeated the Anglo incumbent Board President, Rusty DeBord, in 2017. [Exh. 1, ¶¶ 8–9]. Mr. Floyd resigned from the Board in 2020 to attend law school. [*Id.* at ¶ 9].

## III.    Pearland ISD's Student Achievement

Pearland ISD received an overall "A" rating under the Texas Education Agency's A–F Accountability Rating System for the 2021–2022 school year:[8]

**Texas Education Agency**
**2022 Accountability Rating Overall Summary**
**PEARLAND ISD (020908) - BRAZORIA COUNTY**

**Accountability Rating Summary**

| | Component Score | Scaled Score | Rating |
|---|---|---|---|
| **Overall** | | 94 | **A** |
| **Student Achievement** | | 93 | **A** |
| STAAR Performance | 65 | 91 | |
| College, Career and Military Readiness | 75 | 94 | |
| Graduation Rate | 99.8 | 95 | |
| **School Progress** | | 92 | **A** |
| Academic Growth | 80 | 92 | A |
| Relative Performance (Eco Dis: 32.9%) | 70 | 91 | A |
| **Closing the Gaps** | 96 | 96 | **A** |

[Exh. 5; *see also* Exh. 1, ¶ 11].[9]

---

[8]TEA has not released accountability ratings since 2022 due to ongoing litigation relating to its revised accountability system. *See* TEXAS EDUCATION AGENCY, 2023 Accountability System, available at https://tea.texas.gov/texas-schools/accountability/academic-accountability/performance-reporting/2023-accountability-system (last visited Sept. 22, 2024); TEXAS EDUCATION AGENCY, 2024 Accountability System, available at https://tea.texas.gov/texas-schools/accountability/academic-accountability/performance-reporting/2024-accountability-system (last visited Sept. 22, 2024).

[9]Only 340 of the 1,020 traditional Texas public school district earned an overall A rating in 2022, meaning that Pearland ISD is in the top third of all traditional public school districts in the entire State. *See* TEXAS EDUCATION AGENCY, 2022 State Summary: Traditional and Charter District Ratings, at https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&_program=perfrept.perfmast.sas&_debug=0&ccyy=2022&lev=S&prgopt=reports/acct/state_summary.sas (last visited Sept. 21, 2024).

Additionally, the vast majority of the District's individual campuses received "A" ratings on their "school report cards," and no campus received less than a high "B:"

| Campus | Letter Rating | Numerical Score |
|---|---|---|
| Alexander Middle School | A | 91 of 100 |
| Barbara Cockrell Elementary School | A | 94 of 100 |
| Berry Miller Junior High School | A | 96 of 100 |
| CJ Harris Elementary School | A | 91 of 100 |
| Challenger Elementary School | A | 92 of 100 |
| EA Lawhon Elementary School | A | 94 of 100 |
| Glenda Dawson High School | A | 94 of 100 |
| HC Carleston Elementary School | A | 91 of 100 |
| Leon H Sablatura Middle School | A | 93 of 100 |
| Magnolia Elementary School | A | 94 of 100 |
| Massey Ranch Elementary School | B | 89 of 100 |
| Pearland High School | B | 89 of 100 |
| Pearland Junior High East | A | 93 of 100 |
| Pearland Junior High South | B | 87 of 100 |
| Pearland Junior High West | A | 93 of 100 |
| Robert Turner College and Career High School | A | 93 of 100 |
| Rogers Middle School | A | 93 of 100 |
| Rustic Oaks Elementary School | A | 92 of 100 |
| Jamison Middle School | B | 88 of 100 |
| Shadycrest Elementary School | A | 96 of 100 |
| Silvercrest Elementary School | A | 97 of 100 |
| Silverlake Elementary School | A | 96 of 100 |

[Exh. 6; *see also* Exh. 1, ¶ 11]. This District-wide success reflects Pearland ISD's commitment to *all* of its students, regardless of race or other protected characteristic. [*See* Exh. 1, ¶¶ 6, 11].

## IV.    Plaintiffs' Demonstration Districts

Plaintiffs designated David Ely as an expert witness to support their claim that the District's at-large election system dilutes the voting strength of African American, Hispanic,

13

and Asian voters.  [*See* Dkt. No. 36].  In an effort to satisfy *Gingles I*, Mr. Ely purportedly drew three demonstration districts with combined African American, Hispanic, and Asian CVAPs of greater than 50%.  [*Id.* at p. 12].  None of the demonstration districts drawn by Mr. Ely have a minority CVAP greater than 50% based on a single race.[10]  [*Id.*].  In other words, plaintiffs' claims of dilutive effect rely exclusively on a coalition theory of liability.

<u>**ARGUMENTS AND AUTHORITIES**</u>

**I.      Plaintiffs' Section 2 claims indisputably fail under *Petteway*.**

In *Petteway v. Galveston County*, several plaintiffs challenged the county's redistricting plan for county commissioner elections, alleging that it violated the Fourteenth Amendment, the Fifteenth Amendment, and Section 2 of the Voting Rights Act by diluting the voting strength of a coalition of African American and Hispanic voters.  Relying on *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988) ("*Campos I*")—in which the Fifth Circuit held that distinct minority groups may aggregate their populations for purposes of vote dilution claims brought under the Voting Rights Act—the District Court rendered judgment in the plaintiffs' favor on their Section 2 claims.  *Petteway v. Galveston Cnty.*, 698 F. Supp. 3d 952, 1018 (S.D. Tex. 2023).[11]

A panel of the Fifth Circuit affirmed the Court's decision, but questioned the validity of its own precedent allowing vote dilution plaintiffs to aggregate distinct minority groups for

---

[10]According to plaintiffs' expert, Demonstration District 1 has a combined Asian and African American CVAP of 50.8%, and a combined Hispanic, Asian, and African American CVAP of 66.8%; Demonstration District 2 has a combined Hispanic, Asian, and African American CVAP of 54.9%; and Demonstration District 3 has a combined Hispanic, Asian, and African American CVAP of 51.5%.  [Dkt. No. 36, p. 12].

[11]The Court did not reach the plaintiffs' constitutional claims because such claims did not seek relief broader than the relief afforded by Section 2.  *Petteway*, 698 F. Supp. 3d at 1016–17; *see also Veasey*, 830 F.3d at 265 (where Section 2 plaintiffs "will be entitled to the same relief [] if they prevailed on . . . Fourteenth Amendment claims," the court must decline to decide them based on the doctrine of constitutional avoidance).

14

purposes of establishing the first *Gingles* threshold factor, and expressly called for *en banc* reconsideration of the issue. *Petteway v. Galveston Cnty, Tex.*, 86 F.4th 214, 216–18 (5th Cir. 2023). The panel also noted that "decisions of the Supreme Court over the past two decades have undermined the validity of minority-coalition claims"—most notably *Bartlett v. Strickland*, 556 U.S. 1 (2009), in which a plurality held that "nothing in [Section] 2 grants special protection to a minority group's right to form political coalitions." *Petteway*, 86 F.4th at 217–18.

The Fifth Circuit granted *en banc* review and ultimately overruled *Campos*, holding that Section 2 does not authorize "coalition claims:"

> This court will not remain in the forefront of authorizing litigation, not compelled by law or the Supreme Court, whose principal effects are to (a) supplant legislative redistricting by electing representatives with judicial fiat; (b) encourage divisively counting citizens by race and ethnicity; and (c) displace the fundamental principle of democratic rule by the majority with balkanized interests.
> …
> Galveston County's democratically elected Commissioners Court enacted Map 2. The district court determined that this map was unlawful under Section 2 of the Voting Rights Act and required the commissioners court to adopt a new one with a minority-majority precinct for the county's black and Hispanic voters. Having reconsidered *Campos*, we hold that this decision was wrong. Section 2 does not require political subdivisions to draw precinct lines for the electoral benefit of distinct minority groups that share political preferences but lack the cementing force of race or ethnicity. *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988), and its progeny are OVERRULED.

*Petteway v. Galveston Cnty., Tex.*, 111 F.4th 596, 612–14 (5th Cir. 2024) (en banc). In reaching its decision, the Fifth Circuit specifically noted the tension between coalition claims and "the proviso against proportional representation" and "the purposes of the Voting Rights Act." *Id.* at 603; *see also id.* at 611–12.

In this case, it is undisputed that plaintiffs' Section 2 claims rely on a coalition of Hispanic, Asian, and African American voters to satisfy the first *Gingles* threshold factor. [*See*

15

Dkt. No. 49-1, ¶ 19]. Such claims are now squarely foreclosed by binding Fifth Circuit precedent. The Court should grant summary judgment in favor of the District.

## II.   The Fifteenth Amendment does not apply to plaintiffs' vote dilution claims.

The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. CONST. Amend. XV, § 1. The Supreme Court has rejected the notion that the Fifteenth Amendment applies to vote dilution claims. *See Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000) ("*Reno II*") ("Even if § 5 did not have a different baseline than the Fifteenth Amendment, appellants' argument that § 5 should be read in parallel with the Fifteenth Amendment would fail for the simple reason that we have never held that vote dilution violates the Fifteenth Amendment. Indeed, contrary to Justice Souter's assertion, we have never even 'suggested' as much.") (citations omitted); *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000) ("[T]the Supreme Court has rejected application of the Fifteenth Amendment to vote dilution causes of action.") (citing *Reno II*, 528 U.S. at 334 n.3); *see Bolden*, 446 U.S. at 64 ("The Fifteenth Amendment . . . prohibits only purposefully discriminatory denial or abridgment by government of the freedom to vote 'on account of race [].' Having found that Negroes in Mobile 'register and vote without hindrance,' the District Court and Court of Appeals were in error in believing that the appellants invaded the protection of that Amendment in the present case.").[12]

---

[12]Even if plaintiffs' vote dilution claims are cognizable under the Fifteenth Amendment, courts have held that such claims are "essentially congruent" with claims brought under the Fourteenth Amendment because both Amendments require proof of discriminatory purpose and discriminatory (or dilutive) effect. *See, e.g., Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981). Accordingly, because plaintiffs' Fourteenth Amendment vote dilution claims fail (as demonstrated below), so must their Fifteenth Amendment claims.

16

Additionally, "if a challenged voting practice cannot be shown to violate [Section] 2, which provides greater protection than the Fifteenth Amendment, then *a fortiori* that same voting practice cannot violate the prohibitions of the Fifteenth Amendment itself." *Lopez v. City of Houston*, 2009 WL 1456487, *18 (S.D. Tex. 2009), *aff'd*, 617 F.3d 336 (5th Cir. 2010). "As explained above, the plaintiffs have failed to state a valid claim under [Section] 2 of the [Voting Rights Act].  Accordingly, their Fifteenth Amendment claim also must fail." *Id.*

The Court should grant summary judgment in favor of the District.

## III.  Plaintiffs cannot establish a Fourteenth Amendment violation based on a coalition theory of liability.

As noted above, the Fourteenth Amendment prohibits the State from denying "any person" within its jurisdiction "the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  The Equal Protection Clause does not, however, guarantee *preferential* protection in the form of proportional representation for distinct, politically-aligned minority groups.  *Rucho v. Common Cause*, 588 U.S. 684, 718 (2019) ("Federal judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions."); *Bolden*, 446 U.S. at 75–76 ("The Equal Protection Clause [] does not require proportional representation as an imperative of political organization."); *Reno I*, 520 U.S. at 489 ("The important starting point . . . is the impact of the official action whether it bears more heavily on **one race** than another.") (emphasis added); *Rucho*, 588 U.S. at 704–05 ("Our cases [] clearly foreclose any claim that the Constitution requires proportionate representation or that legislatures [] must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipate statewide vote will be.") (citations and quotations omitted); *Vieth v.*

17

*Jubelirer*, 541 U.S. 267, 288 (2004) ("[T]he Constitution . . . guarantees equal protection of the law to persons, not equal representation  in government to equivalently sized groups. **It nowhere says that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded political strength proportionate to their numbers**.") (emphasis added).

Simply put, there is no legal basis to conclude that the terms "any person" and "political coalition" are interchangeable under the Equal Protection Clause:

> Generally, to establish a Fourteenth Amendment equal protection claim the plaintiff must prove that similarly situated individuals were treated differently . . . To determine whether persons or groups are similarly situated, we inquire as to whether they "are in all relevant respects alike."

*Texas Entertainment Assoc., Inc. v. Hegar*, 10 F.4th 495, 513 (5th Cir. 2021) (cleaned up) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *see also, e.g., Corey v. Airport Svcs., Inc. v. Clear Channel Outdoor, Inc.*, 682 F.3d 1293, 1298 (11th Cir. 2012) ("In reality, Corey is defining the class discriminated against as simply the group of individuals allegedly unfairly treated by Defendants: a kind of tautological equating of cause and effect.  This characteristic alone cannot support properly an Equal Protection Clause claim.  For a group to qualify properly as identifiable for purposes of a group-based discrimination claim, the group must be identifiable by some common set of traits that reach beyond simply not having been selected for a benefit or sharing a desire to do something which the allegedly discriminating party does not want them to do.").

Because the Constitution does not guarantee proportionate representation for subj-majority political groups—*see Bolden*, 446 U.S. at 75–76; *Rucho*, 588 U.S. at 704–05; *Vieth*, 541

18

U.S. at 288—the practical and legal concerns associated with Section 2 coalition claims apply

with equal force to coalition claims brought under the Fourteenth Amendment:

> First, coalition claims extend Section 2's protection to what are essentially political coalitions of distinct racial groups. *See Midland I.S.D.*, 812 F.2d at 1504 (Higginbotham, J., dissenting) (explaining that minority coalitions are "almost indistinguishable from political minorities as opposed to racial minorities"). But *Bartlett* rejected the argument that Section 2 "grants special protection to a minority group's right to form political coalitions." 556 U.S. at 15 [].
> …
> [C]oalition claims have significant practical consequences for both legislative bodies and the judiciary. As the *Nixon* court observed, legislators seeking in good faith to undertake redistricting will be uncertain how to consider more than one racial minority or language group. 76 F.3d at 1391. Should they aim for one "coalition" district or two separate minority districts? How can their decisions avoid having considerations of race "predominate" in legislative line-drawing? *See, e.g., Cooper v. Harris*, 581 U.S. 285, 292 [] (2017); *Shaw v. Hunt*, 517 U.S. 899, 906–07 [] (1996).
> …
> [B]y providing representation to a statutorily protected minority group despite its sub-majority numbers, coalition claims may "cross the line from protecting minorities against racial discrimination to the prohibited . . . goal of mandating proportional representation." *Id.* at 896 (Jones, J., concurring); *see also Allen v. Milligan*, 599 U.S. 1, 28 [] (2023) ("Forcing proportional representation is unlawful and inconsistent with this Court's approach to implementing [Section] 2.").

*Petteway*, 111 F.4th at 610–12 (cleaned up); *see also Campos v. City of Baytown*, 849 F.2d 943, 945

(5th Cir. 1988) ("*Campos II*") (Higginbotham, J., dissenting from denial of reh'g en banc) ("If

a minority group lacks a common race or ethnicity, cohesion must rely principally on shared

values, socio-economic factors, and coalition formation, making the group almost

indistinguishable from political minorities as opposed to racial minorities.").

Indeed, although the Equal Protection Clause provides a vehicle for plaintiffs to bring

vote dilution challenges, it also generally prohibits political subdivisions from "separat[ing] its

citizens into different voting district on the basis of race." *Bethune-Hill v. Virginia St. Bd. of*

19

*Elections*, 580 U.S. 178, 187 (2017) (citing *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).  To avoid

offending the Equal Protection Clause, race-based districting must survive strict scrutiny, even

when implemented for remedial purposes.  *Cooper*, 581 U.S. at 291.  Accordingly, race-based

districting must serve a "compelling interest" and be "narrowly tailored" to that end.  *Gruter

v. Bollinger*, 539 U.S. 306, 326 (2003); *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12

(2013).  In the voting rights context, parties sometimes rely on compliance with Section 2 to

establish a "compelling state interest."  *See, e.g., Callais v. Landry*, 2024 WL 1903930, *18–19

(W.D. La. Apr. 30, 2024).  But now, *Petteway* eliminates Section 2 as a justification for engaging

in race-based districting (even for remedial purposes) in coalition cases.

Furthermore, the notion that the Fourteenth Amendment protects political coalitions,

even when Section 2 does not, makes no sense.  After all, Congress enacted the Voting Rights

Act to help effectuate existing constitutional guarantees.  *See Voinovich v. Quilter*, 507 U.S. 146,

152 (1993).  The Fourteenth Amendment prohibits denying "any person"—*not* any political

coalition—"the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.[13]  As the Sixth

Circuit (relying on one of Judge Higginbotham's pre–*Petteway* dissents) has explained:

> Groups whose ideas or candidates do not obtain a majority of votes lose.
> *LULAC,* 812 F.2d at 1507 (Higginbotham, J., dissenting) ("the essence of our
> republican arrangement is that *voting* minorities lose").  That is not an
> unfortunate by-product of democracy, but is rather the *purpose* of democracy.
> The Equal Protection Clause, the Fifteenth Amendment and the Voting Rights
> Act are aimed only at ensuring equal political opportunity: that every person's
> chance to form a majority is the same, regardless of race or ethnic origin.  *See
> LULAC,* 812 F.2d at 1504 (Higginbotham, J., dissenting) (purpose of Act is to
> provide racial and ethnic minorities with vote they would have had absent
> discrimination).  **Coalition suits provide minority groups with a political**

---

[13]The Fifteenth Amendment is likewise silent as to protections afforded to political preferences.  *See* U.S. CONST. Amend. XV, § 1 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.").

**advantage not recognized by our form of government, and not authorized by the constitutional and statutory underpinnings of that structure**.

*Nixon v. Kent Cnty.*, 76 F.3d 1381, 1392 (6th Cir. 1996) (en banc) (emphasis added).

Accordingly, some courts have recognized that, because Section 2 of the Voting Rights Act "provides more protection than the Equal Protection Clause . . . the plaintiffs' failure to state a viable [Section] 2 claim also forecloses their ability to obtain relief under the Equal Protection Clause." *Lopez*, 2009 WL 1456487, at \*18; *see also Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1344–45 (11th Cir. 2000) ("The parties have cited (and we have found) no case in which a circuit court has concluded that an at-large or multi-member-district electoral system, although not in violation of section 2, unconstitutionally dilutes minority voting strength . . . [W]e question, as a legal proposition, whether vote dilution can be established under the Constitution when the pertinent record has not proved vote dilution under the more permissive [S]ection 2."); *NAACP v. City of Opelika*, 748 F.2d 1473, 1478 n.7 (11th Cir. 1984) ("[I]f the plaintiffs cannot prevail under the generally more easily proved 'results' standard of section 2, it is unlikely that they could prevail on their constitutional claims in any event."). It is therefore unsurprising that, in *Petteway*, the Fifth Circuit identified "whether Plaintiffs can prove that they have been injured, or are entitled to relief, when their claims are premised on a ciliation theory" as a "[p]ertinent consideration on remand." *Petteway*, 111 F.4th at 614 n.13.

Because plaintiffs' constitutional claims rely on the premise that Pearland ISD's at-large electoral system dilutes the voting strength of a minority coalition "that share[s] political preferences but lack[s] the cementing force of race or ethnicity," the Court should grant summary judgment in favor of the District. *See Reno I*, 520 U.S. at 489 ("The important starting

21

point for assessing discriminatory intent under *Arlington Heights* is the impact of the official action whether it bears more heavily on one race than another.").

## IV.    Plaintiffs' illustrative plan subordinates traditional districting principles and allows race to predominate.

When deciding whether a demonstration district satisfies *Gingles I*, the compactness "inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries" because the "recognition of nonracial communities of interest reflects the principle that a State may not assume from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls."  *Perry*, 548 U.S. at 434 (cleaned up); *see also Gonzalez v. Harris Cnty., Tex.*, 601 Fed. App'x 255, 259 (5th Cir. 2015) (holding that traditional district principles "must be considered when analyzing that aspect of the first *Gingles* precondition").

Although the Court need not reach this issue (because plaintiffs' claims all fail as a matter of law), it is worth noting that this case exemplifies the *Petteway* Court's concern that districting plans aimed at protecting minority coalitions will necessarily allow race to predominate over traditional districting principles. *See Petteway*, 111 F.4th at 611 ("[L]egislators seeking in good faith to undertake redistricting will be uncertain how to consider more than one racial minority or language group.  Should they aim for one 'coalition' district or two separate minority districts?  How can their decisions avoid having considerations of race 'predominate' in legislative line-drawing?") (citations omitted).

Plaintiffs' illustrative plan specifically proposes the boundaries for four (of seven total) single-member districts:

22



[Dkt. No. 36, p. 54].  While there is no precise rule for evaluating compactness, courts have considered the following traditional boundaries when evaluating vote dilution claims against school districts: (i) neighborhoods; (ii) subdivisions; (iii) attendance zones; (iv) congressional districts; (v) city limits; and (vi) census blocks.  *See, e.g., Kumar*, 476 F. Supp. 3d at 499–500. Additionally, when evaluating whether a proposed districting plan maintains communities of interest, courts look to "distinctive units" that "share common concerns with respect to one or more identifiable features such as geography, demography, ethnicity, culture, socio-economic status or trade."  *Id.* at 498–99 (quotations omitted).

As detailed below, plaintiffs' illustrative plan allows race to predominate over traditional district principles because it does not respect traditional District boundaries, and also does nor maintain various communities of interest.  Additionally, plaintiffs' illustrative plan groups minority populations that do not share common socio-economic characteristics, such as income level, educational attainment, and home ownership.

23

## A.    Attendance Zones

The plaintiffs' proposed districting plan effectively ignores Pearland ISD's elementary school attendance zones:



As explained by the District's expert, Tom Bryan:

> What is astonishing about the school attendance area splits is not the number of splits – but which school attendance areas are split . . . The school with the highest percent minority students, Carleston, is nearly 84% minority.  And in the Ely plan – this "highest minority" attendance area is split into no less than four different districts.  Notably, one piece of it is in "567" where it is possible that its representation could be split even further.  It is difficult to imagine how this would serve the best interests of the students of Carleston Elementary school if it were represented and run by at least four different trustees – three or more of which would likely not be minorities.  The same can be said for Lawhon.  With 83.5% minority, it is divided into D1, D2 and D567.  Again – it would be split into no less than three different districts – and potentially more depending on how D567 were divided.

[Exh. 7-1, p. 43].  The same issues exist with respect to the District's junior high and high school attendance zones:





[*Id.* at pp. 42–46].

## B.    School Locations

Pearland ISD has twenty-three campuses.  [Exh. 1, ¶ 10].  Under plaintiffs' illustrative

plan, (i) District 1 contains only one school; (ii)  District 2 contains five schools; (iii) District

25

3 contains only one school; (iv) District 4 contains two schools; and (v) the remaining fourteen schools would be divided up between Districts 5, 6, and 7.



[Exh. 7-1, pp. 49–50].  Consequently, plaintiffs' illustrative plan "does not even remotely balance the representation of individual schools" in Pearland ISD, and therefore does not respect or maintain this community of interest.  [*Id.*].

### C.   Neighborhoods

Pearland ISD contains 205 neighborhoods.  [Exh. 7-1, p. 51].  Although plaintiffs' illustrative plan does maintain most neighborhoods across the District, it splits eleven different neighborhoods—five of which are located within District 1:



[*See* Exh. 7, p. 51].    The disproportionate number of split neighborhoods in District 1 demonstrates that plaintiffs drew their proposed lines for the purpose of creating a majority-minority district, and that they simultaneously failed to maintain the communities of interest within District 1.  [*Id.*]

### D.    Social and Economic Characteristics

The African American, Asian, and Hispanic populations within Pearland ISD do not share common socio-economic characteristics:

*Table III.E.1 Household Income in the Last 12 Months by Race and Ethnicity*

| | Household Income in the last 12 Months# | | | |
|---|---|---|---|---|
| | Percent | | | |
| Group | Less Than $50,000 | $50,000 to $100,000 | $100,000 to $150,000 | Greater Than $150,000 |
| Total | 17.6% | 28.2% | 22.9% | 31.3% |
| White | 17.4% | 27.8% | 23.2% | 31.6% |
| Minority | 16.8% | 29.7% | 22.6% | 30.9% |
| Asian | 11.1% | 36.2% | 22.9% | 29.8% |
| Black | 22.3% | 26.1% | 22.9% | 28.7% |
| Hispanic | 14.8% | 29.5% | 22.0% | 33.8% |

# From 2017-2021 ACS 5-Year Estimates: Tables B19001 (Total), B19001A (White Alone), B19001B (Black Alone), B19001D (Asian Alone) and B19001I (Hispanic)

*Table III.E.2 Educational Attainment by Race and Ethnicity*

| | Education Attainment* | | | |
|---|---|---|---|---|
| | Percent | | | |
| Group | Less Than High School | High School or GED | Some College | Bachelor's or Higher |
| Total | 5.3% | 19.6% | 27.0% | 48.2% |
| White | 3.3% | 18.1% | 33.5% | 45.2% |
| Minority | 6.8% | 14.0% | 30.4% | 48.8% |
| Asian | 9.7% | 7.4% | 16.2% | 66.7% |
| Black | 2.9% | 10.8% | 34.8% | 51.5% |
| Hispanic | 8.4% | 21.5% | 36.5% | 33.7% |

\* From 2017-2021 ACS 5-Year Estimates: Tables C15002 (Total), C15002A (White Alone), C15002B (Black Alone), C15002D (Asian Alone) and C15002I (Hispanic)

*Table III.E.2 Home Ownership by Race and Ethnicity*

| | Home Ownership$ | | Percent |
|---|---|---|---|
| | Total | | |
| Group | Total | Own | Own |
| Total | 41,548 | 31,839 | 76.6% |
| White | 24,335 | 19,179 | 78.8% |
| Minority | 21,702 | 16,039 | 73.9% |
| Asian | 5,077 | 4,504 | 88.7% |
| Black | 8,373 | 5,171 | 61.8% |
| Hispanic | 8,252 | 6,364 | 77.1% |

[*See* Exh. 7-1, pp. 39–41]. Simply put, the income distribution of African-American, Asian, and Hispanic Populations "differ markedly from each other." [*Id.* at p. 40]. "Hispanics have high rates of completing high school, but low rates for college," while "Asians have very high rates of completing college. [*Id.*] And, Asians have "very high rates of homeownership" as compared to African-Americans and Hispanics. [*Id.* at p. 41].

The socio-economic differences among the members of plaintiffs' "minority coalition" underscore the concern that "[f]orcibly merging fundamentally different groups for the purpose of providing 'minority' representation could be a cruel hoax upon those who are not cohesive with self-styled minority spokesmen." *Clements II*, 999 F.2d at 897 (Jones, J., joined by Jolly, Smith, Barksdale, and DeMoss, JJ., dissenting); *see also Bartlett*, 556 U.S. at 14–15 ("There is a difference between a racial minority group's 'own choice' and the choice made by a coalition.").

28

Ultimately, plaintiffs' illustrative plan exemplifies race-based districting. If the District were to propose such a plan—*i.e.*, a plan that groups minority populations in single-member districts without regarding to neighborhoods, attendance zones, school locations, or socio-economic characteristics—it would never survive strict scrutiny. There is no compelling government interest to justify imposing single-member districts that are predominantly based on a coalition of races that are more *dissimilar* than not—especially post-*Petteway*—and, even if there was, plaintiffs' plan is not narrowly tailored to achieve it. Meanwhile, the policy rationale behind Pearland ISD's continued use of an at-large system "is not tenuous." *See Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1229 (S.D. Tex. 1997), *aff'd*, 156 F.3d 368 (5th Cir. 1999). School districts are entitled to make "a valid policy choice to avoid single-member elections so that each Board member represents every student and every parent within the [district]. In this way, the Board seeks to avoid the factionalism that they fear would divide a single-district elected board." *Id.*

Furthermore, plaintiffs' illustrative plan is not drawn for the purpose of allowing minority citizens to elect their candidate of choice (which the District's electoral history demonstrates is already possible under the current at-large system),[14] but rather to allow minority citizens to elect representatives to the school board in direct proportion to their population within Pearland ISD. That is not a legitimate purpose under Section 2—or the Constitution.

The Court should grant summary judgment in favor of the District.

---

[14]*See, e.g.,* Exh. 1, ¶¶ 7–9; Exh. 3 at Interrogatory No. 21; Exh. 4].

## CONCLUSION

"Playing with the structure of local government in an effort to channel political factions is a heady game." *Campos II*, 849 F.2d at 945 (Higginbotham, J., dissenting from denial of rehearing *en banc*). Yet, plaintiffs not only invite the Court to involve itself in local politics, they also invite the Court to bestow electoral advantage on distinct non-majority minority voting groups who allegedly share certain political preferences. That is not equal protection under the law—that is favorable treatment in spite of the law. The Court should grant summary judgment in favor of the District.

**THOMPSON & HORTON LLP**

By:   /s/ Stephanie A. Hamm
      Stephanie A. Hamm, Attorney in Charge
      State Bar No. 24069841
      shamm@thompsonhorton.com
      Lisa R. McBride
      State Bar No. 24026829
      lmcbride@thompsonhorton.com
      Alexa Gould
      State Bar No. 24109940
      agould@thompsonhorton.com

3200 Southwest Freeway, Suite 2000
Houston, Texas 77027
Telephone: (713) 554-6714
Facsimile: (713) 583-9611

**ATTORNEYS FOR PEARLAND ISD**

30

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2024, a true and correct copy of the foregoing document was served on all counsel and pro se parties of record via the Court's CM/ECF system, as follows:

William A. Brewer III et al.
BREWER STOREFRONT, PLLC
1717 Main Street, Suite 5900
Dallas, Texas 75201

/s/ Stephanie A. Hamm
Stephanie A. Hamm