IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JESSICA GARCIA SHAFER and DONA KIM MURPHEY, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:22-cv-00387 |
| PEARLAND INDEPENDENT SCHOOL DISTRICT, | § § § | |
| Defendant. | § § | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT
PEARLANDINDEPENDENT SCHOOL DISTRICT'S
<u>MOTION FOR FINAL SUMMARY JUDGMENT</u>**

William A. Brewer III (Bar No. 02967035)
Southern District of Texas Bar No. 92835
wab@brewerattorneys.com
Malvina Palloj (pro hac vice)
NY Bar No. 5980198
mdp1@brewerattorneys.com
Joshua H. Harris
State Bar No. 24127306
Southern District of Texas Bar No. 3635014
jkh@brewerattorneys.com
1717 Main Street, Suite 5900
Dallas, Texas 75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015

# TABLE OF CONTENTS

**Page(s)**

IN THE UNITED STATES DISTRICT COURT ..........................................................................I

SOUTHERN DISTRICT OF TEXAS .......................................................................................I

GALVESTON DIVISION...........................................................................................................I

I. PRELIMINARY STATEMENT .............................................................................................1

II. UNDISPUTED FACTS ..........................................................................................................2

      A.     Long-Standing History of Racism in Pearland ..........................................................2

      B.     Pearland ISD Caters to Anglo Children...................................................................5

III. LEGAL STANDARD.............................................................................................................9

      A.     Motion For Summary Judgment ................................................................................9

IV. ARGUMENTS    10

      A.     The Fourteenth Amendment Prohibits Intentional Vote Dilution .........................10

            1.     The At-Large Voting Scheme Has Been Maintained for A Discriminatory Purpose. .............................................................................11

            2.     The At-Large Voting Scheme Has a Discriminatory Effect......................21

      B.     The Fifteenth Amendment Prohibits Intentional Vote Dilution. ...........................24

      C.     Fifth Circuit's *Petteway* Decision is not Applicable to Plaintiff's Case................28

      D.     Summary Judgment is Not Appropriate at this Stage, as More Discovery is Required. ...................................................................................................................29

V. CONCLUSION.     .........................................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Allen v. State Bd. of Elections*,
    393 U.S. 544 (1969).................................................................................................17

*Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977)..................................................................................12, 13, 22

*Baker v. Carr*,
    369 U.S. 186 (1962) (Frankfurter, J., dissenting) ...................................................18

*Bartlett v. Strickland*,
    556 U.S. 1 (2009).....................................................................................................26

*BAW Manufacturing Co. v. Slaks Fifth Avenue Ltd.*,
    547 F.2d 928 (5th Cir. 1977) .....................................................................................9

*Burns v. Richardson*,
    384 U.S. 73 (1966)...................................................................................................22

*Burton v. City of Belle Glade*,
    178 F.3d 1175 (11th Cir. 1999) ...............................................................................25

*Campos v. City of Baytown, Tex.*,
    840 F.2d 1240 (5th Cir. 1988) ...........................................................................23, 24

*City of Mobile, Ala. v. Bolden*,
    446 U.S. 55 (1980)........................................................................................17, 25, 26

*Clay v. Federal Deposit Ins. Corp.*,
    934 F.2d 69 (5th Cir. 1991) .............................................................................22, 23, 24

*Cubbage v. Averett*,
    626 F.2d 1307 (5th Cir. 1980) ...................................................................................9

*Environmental Defense Fund v. Marsh*,
    651 F.2d 983 (5th Cir. 1981) ................................................................................9, 17

*Erco Industries Ltd. v. Seaboard Coast Line Railroad Co.*,
    644 F.2d 424 (5th Cir. 1981) ................................................................................9, 21

*Everhart v. Drake Management, Inc.*,
    627 F.2d 686 (5th Cir. 1980) .....................................................................................9

*Hall v. Louisiana*,
108 F. Supp. 3d 419 (M.D. La. 2015)..................................................................................26

*Heller v. Namer*,
666 F.2d 905 (5th Cir. 1982) .........................................................................................9, 21

*Jones v. City of Lubbock*,
727 F.2d 364 (5th Cir. 1984) .......................................................................................25, 26

*Joplin v. Bias*,
631 F.2d 1235 (5th Cir. 1980) .............................................................................................9

*Juino v. Livingston Parish Fire Dist. No. 5*,
717 F.3d 431 (5th Cir.2013) ...............................................................................................9

*Kennett-Murray Corp. v. Bone*,
622 F.2d 887 (5th Cir. 1980) .........................................................................................9, 17

*Kreipke v. Commissioner of Internal Revenue*,
32 F.2d 594 (8th Cir. 1929) ..............................................................................................29

*League of United Latin Am. Citizens v. Abbott*,
601 F.Supp.3d 147 (W.D. Tex. May 4, 2022) ..................................................................25

*Lipscomb v Jonsson*,
459 F.2d 335 (5th Cir. 1972) .............................................................................................21

*Lopez v. Abbott*,
339 F. Supp. 3d 589 (S.D. Tex. 2018)....................................................................24, 27, 28

*Lopez v. City of Houston*,
No. CIV. A. H-09-0420, 2009 WL 1456487 (S.D. Tex. May 22, 2009), aff'd,
617 F.3d 336 (5th Cir. 2010) .......................................................................................27, 28

*Mayeaux v. Louisiana Hlt. Service*,
376 F.3d 420 (5th Cir. 2004) ...............................................................................................9

*McCottrell v. White*,
933 F.3d 651 (7th Cir. 2019) .............................................................................................21

*McIntosh County Branch of NAACP v. Dairen*,
605 F.2d 753 ............................................................................................................. *passim*

*Nevett v. Sides*,
571 F.2d 209 (5th Cir. 1978) .......................................................................................12, 26

*Northwest Power Products, Inc. v. Omark Industries*,
576 F.2d 83 (5th Cir. 1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1021, 59
L.Ed.2d 75 (1979)................................................................................................................9

*Page v. Bartels*,
    248 F.3d 175 (3d Cir. 2001)..................................................................................10, 26

*Perez v. Abbott*,
    253 F.Supp.3d 864 (W.D. Tex. 2017).........................................................................22

*Perkins v. City of West Helena*,
    675 F.2d 201 (8th Cir. 1982) ....................................................................................26

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)..........................................12, 14

*Petteway v. Galveston Cnty.*,
    111 F.4th 596 (5th Cir. 2024) ...........................................................................1, 28, 29

*Prejean v. Foster*,
    227 F.3d 504 (5th Cir. 2000) ..............................................................................26, 27

*Roane v. Callisburg Independent School Dist*,
    511 F.2d 633 (5th Cir. 1975) ....................................................................................29

*Rogers v. Lodge*,
    458 U.S. 613 (1982)........................................................................................ *passim*

*Smith* v. *Allwright*,
    321 U.S. 649 (1944)..................................................................................................25

*Terrebonne Par. N.A.A.C.P. v. Jindal*,
    No. CIV.A. 14-069-JJB, 2014 WL 3586549 (M.D. La. July 21, 2014) ......................10, 26, 27

*Terry v. Adams*,
    345 U.S. 461 (1953)..................................................................................................25

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)..............................................................................................23, 24

*Trafigura Trading LLC v. United States*,
    29 F.4th 286 (5th Cir. 2022) ......................................................................................9

*U.S. v. Uvalde Consol. Indep. Sch. Dist*,
    625 F.2d 547 (5th Cir. 1980) ....................................................................................26

*United States Steel Corp. v. Darby*,
    516 F.2d 961 (5th Cir. 1975) ............................................................................22, 23, 24

*United States v. Brown*,
    561 F.3d 420,433 (5th Cir. 2009) ..........................................................................11, 21

*United States* v. *Mosley*,
    238 U.S. 383 (1915)........................................................................................25

*Veasley v. Abbot*,
    830 F.3d 216,*230 f.* (5th Cir. 2016) ............................................................13

*Voinovich v. Quilter*,
    507 U.S. 146 (1993)........................................................................................25

*Voter Information Project, Inc. v. City of Baton Rouge*,
    612 F.2d 208 (5th Cir.1980) ..........................................................................28

*Washington v. Davis*,
    426 U.S. 229 (1976)........................................................................................11

*Washington v. Finlay*,
    664 F.2d 913 (4th Cir. 1981) .........................................................................26

*Westwego Citizens for Better Gov't v. City of Westwego*,
    946 F.2d 1109 (5th Cir. 1991) .......................................................................23

*White v. Regester*,
    412 U.S. 755 (1973)..........................................................................10, 15, 19, 20

*Williams v. City of Dothan*,
    818 F.2d 755 (11th Cir. 1987) .......................................................................22

*York v. City of St. Gabriel*,
    89 F. Supp. 3d 843 (M.D. La. 2015)..............................................................26

*Zimmer v. McKeithen*,
    485 F.2d 1297 (5th Cir. 1973) ..................................................................11, 12

**Statutes**

Code § 11.054 (b)-(c)..............................................................................................18

79 Stat. 437 ...........................................................................................................26

Voting Rights Act Section 2 ...............................................................25, 26, 27, 29

Fourteenth Amendment .......................................................................10, 11, 18, 26, 28

Fifteenth Amendment ...................................................................................... *passim*

https://www.pearlandisd.org/board-of-trustees/board-bios ...........................................5

https://www.pearlandisd.org/board-of-trustees/election-information.............................2

https://www.pearlandtx.gov/government/city-council/kevin-cole ..................................4

U.S. Const ................................................................................................................26

U.S. Const. amend XIV, § 1 .....................................................................................10

Plaintiffs Jessica Garcia Shafer and Dona Kim Murphey ("**Plaintiffs**") file this Memorandum of Law in Opposition of Defendant Pearland Independent School District's ("**Defendant**", "**Pearland ISD**", "**PISD**", or the "**District**") Motion for Summary Judgment, as follows:

## I.
## <u>PRELIMINARY STATEMENT</u>

Defendant fails to mention in its motion that the Fourteenth and Fifteenth Amendments firmly prohibit vote dilution when a party, like Pearland ISD, has a discriminatory purpose and a discriminatory effect in maintaining an at-large voting system. Without question, the record in this case evinces that PISD was told that the at-large election system needed to be changed; however, on numerous occasions PISD refused the community's requests.[1] As a result, the needs of the PISD's minority students were ignored, and PISD continues to fail its minority students.

Now, Defendant attempts to over apply the Fifth Circuit's decision in *Petteway v. Galveston County*, which was decided under a distinguishable set of facts, to argue that regardless of discriminatory purpose and discriminatory effect of the at-large voting system in PISD, Plaintiffs' case should be summarily adjudicated. However, nothing in *Petteway* expressly states or even implies that Fourteenth and Fifteenth Amendment claims, like here, are not viable. Quite the contrary, Petteway expressly allowed coalition plaintiffs to pursue their constitutional claims. On that basis, the Court should deny Defendant's overreaching Motion for Summary Judgment.

---

[1] *See*, *e.g.*, Ex. 3 at ¶ 7, 14, 16; Ex. 4 at ¶ 8.

1

## II.
## UNDISPUTED FACTS

### A. Long-Standing History of Racism in Pearland

Despite Pearland being rated one of the most diverse cities in the United States,[2] the city has a deep-rooted history of racism and even painted itself as the "Capital of Caucasia" to attract new residents.[3] Despite the moniker no longer being used, longstanding racist attitudes persist in Pearland with phrases such as "Don't Houston our Pearland," a saying that seeks to keep in place the Anglo power structure that permeates throughout Pearland.[4]

This backdrop is especially important considering both the brazenly racist and xenophobic comments of Pearland's current mayor, Kevin Cole ("**Mr. Cole**"), and the racist, xenophobic, and homophobic comments on social media by previous city council member (for over 15 years) Woody Owens ("**Mr. Owens**"). These individuals have a direct impact on the Pearland ISD elections. Members of the governing body of Pearland, like Mr. Cole and Mr. Owens, and School Board Trustees are elected at the same time as a part of mandatory joint elections pursuant to the Texas Education Code and the Texas Election Code.[5] Accordingly, Mr. Cole's and Mr. Owens' use of racism, xenophobia, and homophobia on the campaign trial in Pearland has a direct impact on the electorate responsible for electing PISD Board members.

---

[2] *See*, *e.g.*, Russell Falcon, *Pearland, Sugar Land ranked in top 5 for diversity in U.S.*, CW39 HOUSTON (Oct. 10, 2024, 10:10 AM), https://cw39.com/news/local/pearland-sugar-land-ranked-in-top-5-for-diversity-in-u-s/.

[3] *See*, *e.g.*, Dkt 1 at 12–13.

[4] *See*, *e.g.*, *id.*

[5] *See*, *e.g.*, PEARLAND ISD, *Election Information*, https://www.pearlandisd.org/board-of-trustees/election-information (last visited Oct. 10, 2024).

2

For instance, Mr. Cole made racist and xenophobic comments related to the Pearland ISD election in the below post on Facebook[6]:



Mr. Cole then followed up with comments directly targeted at the Pearland ISD School Board election[7]:



---

[6]    Joe    Tse,    *Pearland's    Long    History    with    Racism,*    MEDIUM    (Oct.    9,    2020), https://josephsay.medium.com/pearlands-long-history-with-racism-78416be651c8.

[7] *See, e.g., id.*

3

Mr. Cole has been a Politician in Pearland for nearly 20 years and is Pearland's Mayor[8]:



Additionally, Pearland longstanding city council member Mr. Owens has also shared various racist, xenophobic, and homophobic comments on Facebook[9]:



---

[8] *Kevin Cole*, PEARLAND TEX. GOV., https://www.pearlandtx.gov/government/city-council/kevin-cole (last visited Oct. 10, 2024).

[9] *Pearland Councilman's Facebook Content Criticized by NAACP*, CLICK 2 HOUSTON, https://www.click2houston.com/video/news/2020/10/16/pearland-councilmans-facebook-content-criticized-by-naacp/ (last visited Oct. 10, 2024).

## B. Pearland ISD Caters to Anglo Children

According to Texas Education Agency's 2022-23 Texas Academic Performance Report ("**TAPR**"), Pearland ISD was comprised of **70.1 percent minority students**.[10] In other words, Pearland ISD has 21,237 students and 14,679 of these students are minority students. Despite having such a diverse student body, every single Board of Trustee Member of Pearland ISD is Anglo:[11]

| Position | Name | Picture |
|---|---|---|
| **President** | Crystal Carbone | |
| **Vice President** | Sean Murphy | |
| **Secretary** | Nanette Weimer | |
| **Board of Trustee** | Toni Carter | |

---

[10] *See*, *e.g.*, Ex. 1.
[11] *Board Bios*, PEARLAND ISD, https://www.pearlandisd.org/board-of-trustees/board-bios (last visited Oct. 10, 2024).

5

| | | |
|---|---|---|
| **Board of Trustee** | Kristofer Schoeffler | |
| **Board of Trustee** | Amanda Kuhn | |
| **Board of Trustee** | Jenny Francis— | |

This trend does not stop at the Board of Trustee level. The power structure within the administration at Pearland ISD is likewise predominantly Anglo[12]:

| **Position** | Name | Picture |
|---|---|---|
| **Superintendent** | Larry Berger[13] | |
| **Deputy Superintendent** | Kelly Holt | |

---

[12] *Administration – Superintendent's Cabinet*, PEARLAND ISD, https://www.pearlandisd.org/about-us/administration/administration (last visited Oct. 10, 2024).

[13] Each Superintendent during the history of Pearland ISD has been an Anglo male. *See*, *e.g.*, *District History*, PEARLAND ISD, https://www.pearlandisd.org/about-us/our-district/district-history (last visited Oct. 10, 2024).

6

| **Chief Technology Officer** | Jon-Paul Estes | |
|---|---|---|
| **Assistant Superintendent of Educational Services** | Dr. Lisa Nixon | |
| **Executive Director of Human Resource Services and Communications** | Dr. Sundie Dahlkamp | |
| **Executive Director of Elementary Schools** | Mario Keller | |

Unsurprisingly, Pearland ISD Anglo-dominated leadership has prioritized Anglo student performance. In fact, an analysis of Pearland ISD's academic performance data from 2017 to 2023 reveals very troubling trends regarding performance gaps between Anglo and minority students.

7

The academic performance data shows that Pearland ISD's Anglo students far outperform its minority students and the District's average[14]:

| | All Grades All Subjects | | | | | | |
| | Meets Grade Level or Above | | | | Differenced from Anglo Students | | |
| Year | District | Anglo | Black | Hispanic | District | Black | Hispanic |
|---|---|---|---|---|---|---|---|
| 2017 | 64% | 73% | 55% | 52% | -9% | -18% | -21% |
| 2018 | 66% | 74% | 56% | 55% | -8% | -18% | -19% |
| 2019 | 68% | 76% | 59% | 58% | -8% | -17% | -18% |
| 2021 | 61% | 71% | 48% | 50% | -10% | -23% | -21% |
| 2022 | 67% | 76% | 55% | 57% | -9% | -21% | -19% |
| 2023 | 68% | 78% | 56% | 58% | -10% | -22% | -20% |
| Average: | 66% | 75% | 55% | 55% | -9% | -20% | -20% |
| | ±2.5% | ±2.2% | ±3.3% | ±3.1% | | | |
| | | | Count of Standard Deviations: | | -0.75 | -1.66 | -1.65 |

In fact, the distribution of grade-level proficiency rates by race further crystalizes the performance gaps between Anglo students and minority students[15]:



The consistent nature of the 20% performance gap between Anglo students and Black and Hispanic students over the last six years, begs the question as to why PISD has

---

[14] *See, e.g.,* Ex. 1.
[15] *See, e.g., id.*

not addressed it. The totality of circumstances shows that the issue has not been addressed by Pearland ISD's leadership because the Anglo population it seeks to serve and prioritize is performing well. This reality is at the heart of this lawsuit because each student, regardless of race, deserves to be treated equally in Pearland ISD and to have representation to ensure such fair and equitable treatment.

## III.
## LEGAL STANDARD

### A.  Motion For Summary Judgment

Generally, in deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the party resisting the motion.[16] The burden to establish the absence of a genuine issue as to material facts is thus on the movant and all doubts must be resolved against the movant.[17] The Court is not empowered, on a motion for summary judgment, to resolve material factual disputes.[18] In other words, summary judgment is reserved for situations where the movant has established a right to judgment with such clarity that the non-movant cannot recover under discernible circumstances.[19]

---

[16] *See*, *e.g.*, *Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 433 (5th Cir. 2013); *Cubbage v. Averett*, 626 F.2d 1307, 1308 (5th Cir. 1980); *Joplin v. Bias*, 631 F.2d 1235, 1237 (5th Cir. 1980); *Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83, 85 (5th Cir. 1978), cert. denied, 439 U.S. 1116 (1979); *BAW Manufacturing Co. v. Slaks Fifth Avenue Ltd.*, 547 F.2d 928, 930 (5th Cir. 1977).

[17] *See*, *e.g.*, *Erco Industries Ltd. v. Seaboard Coast Line Railroad Co.*, 644 F.2d 424, 428 (5th Cir. 1981); *Heller v. Namer*, 666 F.2d 905, 912 n.14 (5th Cir. 1982).

[18] *See*, *e.g.*, *Trafigura Trading LLC v. United States*, 29 F.4th 286, 299 (5th Cir. 2022); *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981); *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980).

[19] *See*, *e.g.*, *Mayeaux v. Louisiana Hlt. Service*, 376 F.3d 420 (5th Cir. 2004); *Joplin v. Bias*, 631 F.2d 1235, 1237 (5th Cir. 1980); *Everhart v. Drake Management, Inc.*, 627 F.2d 686, 690 (5th Cir. 1980).

# IV.
# ARGUMENTS

## A.  The Fourteenth Amendment Prohibits Intentional Vote Dilution

The Fourteenth Amendment prohibits the State from denying "any person" within its jurisdiction "the equal protection of the laws."[20] A voting scheme violates the Fourteenth Amendment if it is planned to or operates as a "purposeful [device] to further racial discrimination by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population."[21] Indeed, vote dilution cases have been brought under the Equal Protection Clause and tried on the merits since the inception of the Fourteenth Amendment.[22]

Defendants in this case claim that Plaintiffs are prohibited from bringing a vote dilution claim under the Fourteenth Amendment because Plaintiffs represent multiple different minorities in PISD; or, in other words, by virtue of their different races they are a prohibited coalition. By Defendant's reasoning, if PISD's voting system discriminates against more than one group based on race, the Fourteenth Amendment approves. Unsurprisingly, no court in American history has ever sided with Defendant's strained interpretation of the Equal Protection Clause.

---

[20] U.S. Const. amend XIV, § 1.

[21] *Rogers v. Lodge*, 458 U.S. 613, 617 (1982).

[22] *White v. Regester*, 412 U.S. 755, 767 (1973) ("the district court considered the Mexican Americans in Bexar County to be an identifiable class for Fourteenth Amendment purposes and proceeded to inquire whether the impact of the multimember district on this group constituted invidious discrimination"); *see also, Rogers*, 458 U.S. at 624; *Page v. Bartels*, 248 F.3d 175, 193 n.12 (3d Cir. 2001) (establishing that vote dilution claims are viable under both the Fourteenth and Fifteenth Amendment and the Supreme Court's reservation to opine on the Fifteenth Amendment's applicability to vote dilution claims does not foreclose their viability as a matter of law); *Terrebonne Par. N.A.A.C.P. v. Jindal*, No. CIV.A. 14-069-JJB, 2014 WL 3586549, at *5 (M.D. La. July 21, 2014).

As Defendant readily admits, cases charging that a voting scheme unconstitutionally diutes the voting strength of racial minorities are subject to the standard of proof generally applicable to Equal Protection Clause Cases.[23]

Thus, in order to prevail on a vote dilution claim under the Fourteenth Amendment, Plaintiff in this case must show that the law has a discriminatory purpose and a discriminatory effect—the same standard applicable to all Equal Protection claims.[24]

**1.   The At-Large Voting Scheme Has Been Maintained for A Discriminatory Purpose.**

The current at-large voting system in PISD, although arguably facially neutral, has been subverted to invidious purposes. Although "at-large . . . districting schemes are not per se unconstitutional . . . where the petitioner can demonstrate that 'its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice,' . . . such districting schemes are constitutionally infirm."[25]

In order to prove an intentional vote dilution claim, the challenger need not show the law was enacted and/or maintained for the *sole purpose* of discriminating against a minority racial group; rather the challenger need only show that racial discrimination was *one of the many purposes* of the official action.[26] Plaintiff must prove that "a discriminatory

---

[23] *Rogers*, 458 U.S. at 619.

[24] *Washington v. Davis*, 426 U.S. 229, 240 (1976).

[25] *Zimmer v. McKeithen*, 485 F.2d 1297, 1304–05 (5th Cir. 1973) (internal citations omitted).

[26] *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (However, many courts need not get lost in the weeds looking, for "racial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur") (citing *Velasquez v. City of Abilene*, 725 F.2d 1017, 1022 (5th Cir. 1984) (emphasis added)).

purpose has been a motivating factor" in the challenged action.[27] That is, plaintiffs must show that those who carried out the challenged action "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."[28] The Fifth Circuit in *Zimmer* lays out factors, approved by the Supreme Court in *Rodgers v. Lodge*, which guide this Court in finding discriminatory purpose for intentional voting dilution claims.[29] The factors listed in *Zimmer* include:

1. Whether minority group members have equal access to the political process;

2. Whether past discrimination has the present effect of discouraging participation by minority members in the political process;

3. Whether the policy underlying the use of at-large district is tenuous;

4. Whether the governmental body in question is unresponsive to the needs of the minority community.[30]

Although a plaintiff is not required to show evidence that all four *Zimmer* factors are present to show intentional unconstitutional vote dilution, the evidence in this case enables Plaintiffs to do so.[31] Because it is unlikely an official will enact a voting law in the name of publicly condemning minority racial groups, the Fifth Circuit advises Courts to

---

[27] *Village of Arlington Heights v. Metropolitan Housing Development Corp*, 429 U.S. at 265–66 (1977).

[28] *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 277 (1979) ("Discriminatory intent is simply not amenable to calibration. It either is a factor that has influenced the [governmental action] or it is not.").

[29] *Rogers*, 458 U.S. at 624 ("These factors were primarily those suggested in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973)"); *Nevett v. Sides*, 571 F.2d 209, 219 (5th Cir. 1978) ("The standards for decision in dilution cases are developed primarily in cases dealing with (at-large) districting (citing, inter alia, *White v. Regester, Whitcomb v. Chavis, and Zimmer*")).

[30] *McIntosh County Branch of NAACP v. Dairen*, 605 F.2d 753, 756 (citing *Zimmer v. McKeithen*, 485 F.2d 1297, 1305 (5th Cir. 1973); *see also Rogers*, 458 U.S. at 619 n.8.

[31] *McIntosh County Branch of NAACP*, 605 F.2d at 756. ("The Zimmer framework of analysis is designed to facilitate resolution of the ultimate issue, but it is not the sole method of resolution. A plaintiff is not limited to evidence that fits within the Zimmer framework and might in some cases prevail even though not all the four Zimmer inquiries tend to show unconstitutional dilution").

12

take a "sensitive inquiry into the circumstantial evidence" when making a determination on discriminatory purpose in these types of cases.[32] This should be done by looking at the "totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."[33]

Here, one of the strongest indicators of discriminatory intent is that the at-large election system, in its maintenance and operation has a long history of diluting the voting strength of Pearland's minority populations, and the evidence points to both discriminatory intent and effect in violation of the Equal Protection Clause. Plaintiffs present evidence of historical and current racial discrimination in PISD, including documented racist incidents within the district, which were enabled by the all-Anglo Board of Trustees. The Supreme Court in *Arlington Heights* recognized that discriminatory intent can be inferred from the sequence of events and the foreseeable disparate impact of policies.[34]

The historical background of Pearland ISD's at-large election system demonstrates a consistent pattern of racial exclusion and voter suppression against minority communities. The system, in place since the District's founding, was designed to and is maintained to largely disenfranchise and exclude minority communities from meaningful political participation. Over the last six years, as minority populations have grown and

---

[32] *Veasley v. Abbot*, 830 F.3d 216, 230 n.12 (5th Cir. 2016) (citing *Lodge v. Buxton*, 639 F.2d 1358, 1363 (5th Cir. 1981) (Instead, we have noted that discriminatory intent in this context may be shown through circumstantial evidence, as discriminatory motives are often "cleverly cloaked in the guise of propriety").

[33] *Rogers*, 458 U.S. at 618.

[34] *See, e.g., Arlington Heights*, 429 U.S. at 252.

13

become more politically engaged, every minority candidate who has run for the Board of Trustees has been defeated by Anglo candidates.[35]

Additionally, the contemporary effects of this electoral system cannot be ignored. The continued defeat of qualified minority candidates and the preservation of an all-Anglo Board of Trustees in a district where students of color represent over 70% of the student body evinces that the system was designed and maintained "because of" its disparate impact on minority voters, rather than "in spite of" that impact.[36]

The pattern of exclusion, particularly with an at-large system that allows an Anglo voting bloc to dominate elections, is precisely the type of discrimination that the Equal Protection Clause was designed to prohibit. While at-large systems are not unconstitutional *per se*, they become unconstitutional when they are maintained for the purpose of perpetuating racial inequality in political representation, as is the case here.[37]

Furthermore, Plaintiffs have pointed to indisputable evidence of: (a) a racially charged history in Pearland, (b) current incidents within PISD that evince a hostile racial environment, and (c) PISD's leadership continual failure to convert to a single member district.[38] The Board's indifference to these incidents, coupled with its failure to diversify or fairly represent the interests of non-Anglo students, provides additional circumstantial evidence of discriminatory intent in the continued maintenance and operation of the at-large election system within PISD.

---

[35] *See* Exh. 3 at ¶¶ 5, 10 (describing how three minority candidates all lost their elections to white candidates despite similar educational, professional, and community involvement backgrounds).

[36] *See, e.g., Feeney*, 442 U.S. at 279; Exh. 3 at ¶¶ 5, 10.

[37] *See, e.g., Rogers*, 458 U.S. 613, 617 (1982); *ee* Exh. 3 at ¶ 16.

[38] *See* Exh. 3 at ¶¶ 7, 14.

### i.  The Current At-Large Voting System Limits Minority Access to The Political Process.

The current at-large voting scheme in PISD limits minority members' equal access in the political process. In *McIntosh*, the Fifth Circuit noted that minorities being harassed to prevent them from running from City council shows a lack of equal access to the political process.[39] Indeed, the "lack of equal access to the political process" inquiry is broader than minority members' ability to be placed on the ballot; it encompasses barriers to minority participation in the campaigning phase.[40] In the present case, the current at-large voting system has created an avenue for racism within the PISD community that acts as a barrier for all minority PISD board candidates.[41] In 2019, an email about three minority board candidates appeared to incite PISD voters with Islamophobic and xenophobic beliefs.[42] The inflammatory messaging was designed to cripple the minority candidates' campaigns, stoke confusion and sow racial and religious divisiveness, and intimidate minority candidates from running for the school board in PISD.[43] Pearland's mayor engaged in the same type of messaging on his Facebook page regarding certain minority candidates for PISD's Board of Trustees.[44]

---

[39] *McIntosh County Branch of NAACP*, 605 F.2d at 757.

[40] *Id.* at 757; *see also White*, 412 U.S. at 766–69 (1973) (issue is whether "political process leading to nomination and election" are equally open to all).

[41] *See*, *e.g.*, Dkt. 1 at ¶ 41.

[42] *Id.* (citing Jacob Carpenter, *Email About Pearland Candidates Targets Anti-Islam, Anti-Immigrant Voters*, HOUSTON    CHRONICLE    (Apr.    27,    2019),    https://www.houstonchronicle.com/news/houston-texas/houston/article/Email-about-Pearland-candidates-targets-13799450.php).

[43] *See*, *e.g.*, Dkt. 1 at ¶ 41; *see also* Ex. 3 ¶ 8, 9 (Joseph Say affidavit stating "We experienced significant racial hostility… The inflammatory flyer was clearly intended stoke racial and religious fear among white voters… I believe this flyer was a racially charged effort to mobilize white voters against [minorities]").

[44]    Joe    Tse,    *Pearland's    Long    History    with    Racism,*    MEDIUM    (Oct.    9,    2020), https://josephsay.medium.com/pearlands-long-history-with-racism-78416be651c8.

15

The history of PISD's Board of Trustees elections further underscores the discriminatory purpose and effect of the at-large system. Despite the District's increasing diversity, the Board has remained exclusively Anglo. The resistance to transitioning to a single-member district system—one that would provide minority communities with a fair opportunity to elect candidates of their choice—demonstrates an unwillingness to address the racial inequities perpetuated by the current system.

The historical failure to address racially charged incidents, discriminatory and racially motivated discipline practices, and the unaddressed achievement gaps between Anglo and minority students are indicative of a broader pattern of racial exclusion within PISD. This exclusion is both reflective of, and perpetuated by, the at-large voting system.

> **ii.   The Consistent Failures of Minority Candidates Shows Past Discrimination has the Present Effect of Discouraging Minority Participation in the Political Process.**

The failure of minority candidates being elected serves as important evidence that the current voting system purposefully dilutes minority voter participation.[45] As the Fifth Circuit instructs, when past discrimination and a present disproportionate number of minority representatives is shown, then the burden shifts to defendant to prove that past discrimination no longer influences the present.[46] Here, the complaint alleges a plethora of facts showing that minorities are repeatedly defeated by Anglo voting blocs that reject minority candidates and elect Anglo candidates, yet these facts go unaddressed in

---

[45] *Rogers*, 458 U.S. at 623–24 ("Because it is sensible to expect at least some blacks would have been elected in Burke County, the fact that none have ever been elected is important evidence of purposeful exclusion")

[46] *McIntosh County Branch of NAACP*, 605 F.2d at 759 (Noting that when present disproportion in minority voting registration and election of representatives is proved, then the burden shifts to the defendant to prove that the past discrimination no longer influences the present).

16

Defendant's motion.[47] In the present case, the past discriminatory effect of the at-large voting scheme in PISD is obvious. Though over 70% of PISD students are minorities, 100% of the school district's trustees are Anglo.[48] Despite continued and overwhelming support from minority voters, since 2011, all 12 minority candidates who ran for the board lost their election, except for one.[49] The complaint illustrates the obvious flaw in the at-large voting system—the at-large voting system allows a slightly Anglo majority to win every election, control every seat, and make every decision.[50]

The complaint further alleges that the voting system serves no purpose other than to enable a slight voting majority to dominate the electoral process, leaving the interests of large minority communities ignored.[51] The constant failure of the preferred candidates of minorities has essentially prohibited minorities from voting all together.[52] While discriminatory impact of a law alone will not suffice to conclusively show discriminatory purpose, many courts have noted that official action that bears more heavily on one race than another gives a good inclination of discriminatory purpose.[53] This Court should find no differently here, especially for the purposes of this summary judgment motion.[54]

---

[47] *See, e.g., Dkt. 1* at ¶ 34.

[48] *Id.* ¶ 3.

[49] *Id.*; Defendant's allege that Charles Gooden, Jr. won his election to be a trustee on the on Pearland ISD's Board. *See, e.g.*, Mot. at 11.

[50] *Id.*

[51] *Id.*

[52] *Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969) (at-large elections could nullify the ability of minority voters "to elect the candidate of their choice just as would prohibiting some of them from voting").

[53] *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 70 (1980) (noting that where "the impact of an official action . . . bears more heavily on one race than another" courts are given an important starting point for determining discriminatory purpose).

[54] *See, e.g., Marsh*, 651 F.2d at 991 (asserting that the Court may not resolve material factual disputes on summary judgment); *Bone*, 622 F.2d at 892 (same).

17

### iii.    The Officials Elected Due to the At-Large Voting System in PISD are Unresponsive to Minority Needs.

Time and time again, PISD's school board has failed to respond appropriately to the needs of its minority constituents. Proof of unresponsiveness by the public body in question to the group claiming injury is the most persuasive way a court can infer that a voting system has a discriminatory purpose.[55] To determine if a public body is responsive to the needs of its minority constituents, courts must make highly factual and substantive determinations of "good governance."[56]

The Fifth Circuit in *McIntosh County Branch of the NAACP* acknowledged that discriminatory hiring, firing, and promotional decisions can show an unresponsiveness of a public body to a minority group.[57] The Supreme Court in *Rodgers v. Lodge* acknowledged "reluctancy of the county to remedy [minority] complaints" as unresponsive.[58] In *White v. Regester*, the court found unresponsiveness when the county legislator did not delegate to the socioeconomic interests of Mexican-Americans.[59] The Plaintiffs in this case allege the PISD school board is unresponsive to the needs of minorities for all the same reasons.

First, PISD has shown to discriminatorily promote people within the school district.[60] In 2019, an African American student filed a federal lawsuit which accused

---

[55] *Rodgers*, 458 U.S. at 625 n.9 (An important element of [showing whether discriminatory purpose may be inferred] is proof of unresponsiveness by the public body in question to the group claiming injury).

[56] *McIntosh County Branch of NAACP*, 605 F.2d at 759 (Perhaps the most sensitive and difficult inquiry a district court must conduct under Zimmer is whether the elected officials in question are unresponsive to minority needs. The evidence relevant to this question is likely to be hotly disputed and wide-ranging); *see also* L. Tribe, American Constitutional Law § 13-7, at 750 n.4 (Court must make hard substantive decisions of political theory); *see also Baker v. Carr*, 369 U.S. 186, 300–02 (1962) (Frankfurter, J., dissenting) (Fourteenth Amendment "provides no guide for judicial oversight of the representation problem").

[57] *McIntosh County Branch of NAACP*, 605 F.2d at 759-60.

[58] *Rodgers*, 458 U.S. at 625.

[59] *White*, 412 U.S. at 767–79.

[60] *See McIntosh County Branch of NAACP*, 605 F.2d at 759-60.

18

administrators at Berry Miller Junior High of using black permanent marker to color in designs in the students' haircuts.[61] In response to the federal lawsuit, one of the accused administrators, Tony Barcelona, was not reprimanded but rather later promoted to principal of the school[62]—despite 1,057 PISD community members petitioning for Barcelona's termination.[63]

Second, PISD has failed to respond to remedy minority complaints.[64] In 2019, a Muslim student at the High School was told she would need a note from her religious leader to wear her hijab.[65] In 2020, PISD teacher Holly Hardwicke Kanipes, made a Facebook post that inferred that African Americans should stop (expletive) about slavery.[66] The PISD school board was predictably unable to handle these situations on their own and the NAACP of Brazoria County had to step in to prompt the school to provide Holly Hardwicke Kanipes diversity training.[67] Later in 2020, former PISD board candidate wrote

---

[61] *See*, *e.g.*, Dkt. 1 at ¶ 43 (citing Shelby Webb, *Second Pearland ISD Student Accuses Administrator of Coloring His Scalp with a Marker*, HOUSTON CHRONICLE (January 24, 2020), https://www.houstonchronicle.com/news/houston-texas/houston/article/Second-Pearland-ISD-student-accuses-administrator-15001523.php).

[62] *See*, *e.g.*, Dkt. 1 at ¶ 43.

[63] *See*, *e.g.*, Tonya Henderson-Smith, *TERMINATE Tony Barcelona at Berry Miller Junior High in Pearland ISD!!!*, CHANGE.ORG (Aug. 20, 2019), https://www.change.org/p/parents-terminate-tony-barcelona-at-berry-miller-junior-high-in-pearland-isd.

[64] *Rodgers*, 458 U.S. at 625.

[65] *See*, *e.g.*, Dkt. 1 at ¶ 42 (citing Natalie Hee, *Pearland ISD Student Told She Would Need a Note From a Religious Leader to Wear Hijab*: Parents, FOX 26 HOUSTON (May 22, 2019), https://www.fox26houston.com/news/pearland-isd-student-told-she-would-need-a-note-from-a-religious-leader-to-wear-hijab-parents).

[66] *See*, *e.g.*, Dkt. 1 at ¶ 45 (citing Sofia Ojeda, *Pearland ISD Teacher Under Fire for 'White Slaves' Post*, CLICK 2 HOUSTON (August 11, 2020), https://www.click2houston.com/news/local/2020/08/12/pearland-isd-teacher-under-fire-for-white-slaves-post/).

[67] *Id.*

an essay on the racism in Pearland and attributed "blatantly racist people holding office in Pearland" to the at-large elections.[68]

Lastly, PISD has failed to meet the socioeconomic needs of minorities in the schools.[69] As alleged in the complaint, 71% of Anglo students meet grade level across all subjects and grades tested in 2021, but only 50% of Hispanic Students, 48% of African American students, 42% of economically disadvantaged students, and 28% of English learners met grade level.[70]

The Board has time and time again failed to effectively respond to overt acts of racism within their schools and to meet the needs of the minorities with in the PISD community.[71] Since 2020, PISD has been put on alert by members of the community that the current at-large election system is contributing to the racism in Pearland.[72] Yet, PISD refuses to address the voting system that would give minority members a voice to help fix the problem.[73] There is no bigger inference of intent than the knowledge of an injustice, a means to address the injustice, and willful refusal to make the needed change.[74] This Court need not find PISD's sole purpose of maintaining the at-large voting system is to discriminate against minority citizens but finding no evidence of discriminatory intent here

---

[68] *Id.* ¶ 46.

[69] *See White*, 412 U.S. at 767–79.

[70] *See, e.g.*, Dkt. 1 at ¶ 39.

[71] *See, e.g.*, Dkt. 1 at ¶ 42-45.

[72] *See, e.g.*, Dkt. 1 at ¶ 46. *See also* Ex. 3 ¶ 7, 14; Ex. 4 ¶ 14, 19.

[73] *See* Exh. 3 ¶ 14 (explaining that any efforts from minorities to advocate for a single-member district system have been continuously ignored by PISD).

[74] *McCottrell v. White*, 933 F.3d 651, 657 (7th Cir. 2019) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence. Indeed, circumstantial evidence is sufficient to establish guilt beyond a reasonable doubt in criminal cases and deserves no less respect in civil cases") (internal citations omitted).

requires turning the proverbial blind eye to the longstanding and pervasive history of discrimination within Pearland and PISD.[75]

Even under normal summary judgment circumstances the movant must show there is no material dispute in facts.[76] Because the determination of whether a voting scheme is maintained with the purpose to discriminate relies so heavily on the facts Courts are instructed to exercise even more caution in granting motions for summary judgment in this context.[77] Defendant has not offered any evidence to dispute Plaintiffs' claims that PISD's at-large voting system has been operated and maintained for a discriminatory purpose. Therefore, there is a dispute of facts and Defendants cannot succeed in summary judgement.[78]

**2.    The At-Large Voting Scheme Has a Discriminatory Effect.**

Discriminatory impact is a measure of racially disproportionate impact.[79] When considering disparate effect, the focus should be on whether the challenged requirements operate to disqualify minority voters at a substantially higher rate than anglos.[80] A scheme

---

[75] *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (However, many courts need not get lost in the weeds looking, for "racial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur").

[76] *See, e.g.*, *Erco Industries*, 644 F.2d at 428; *Heller*, 666 F.2d at 912 n.14.

[77] *See Lipscomb v Jonsson*, 459 F.2d 335 (5th Cir. 1972) (the Court of Appeals felt that a proper reading of the *Whitcomb* decision required that the case be allowed to proceed to trial, the court feeling that the plaintiffs were entitled to a chance to prove their case on the basis of either (1) a showing that the Dallas election plan was a purposeful attempt by the white majority or by the Dallas city fathers to fence ghetto area residents out of the city council, or (2) a showing that ghetto residents had been effectively excluded from participation in the process of selecting city council members. The court concluded that summary dismissal without exploration of these topics had been improper, and it vacated and remanded the case for further proceedings).

[78] *See, e.g.*, *Clay v. Federal Deposit Ins. Corp.*, 934 F.2d 69, 70 (5th Cir. 1991) (stating that "if any material facts are disputed, summary judgment is improper, as we will not weigh the evidence or resolve material fact disputes."); *United States Steel Corp. v. Darby*, 516 F.2d 961, 963 (5th Cir. 1975).

[79] *Arlington Heights*, 429 U.S. at 264–65.

[80] *Williams v. City of Dothan*, 818 F.2d 755, 764 (11th Cir. 1987).

21

that would operate to minimize or cancel out the voting strength of racial or political elements of the voting population would constitute invidious discrimination.[81] A voting scheme has a discriminatory effect when the minority group is politically cohesive, and that its preferred candidate is usually defeated due to a racial voting bloc.[82]

### i.   The Minorities in PISD Vote Cohesively for Minority Candidates.

Generally, to prove racially polarized voting between Anglos and minorities, proof of "a consistent relationship between [the] race of the voter and the way in which the voter votes" proves that the "minority group members constitute a politically cohesive unit."[83] As the Fifth Circuit noted, "the central focus" for the cohesion inquiry is upon voting patterns, and a minority group is politically cohesive if it votes together.[84] Statistical expert evidence is sufficient to establish cohesive voting.[85]

Here, Plaintiffs offered proof through expert statistical analysis and opinion that minorities in PISD have a pattern of voting for preferred minority candidates that receive little Anglo support. Specifically, Dr. Loren Collingwood found that, "[a]s a general rule, minority voters favor minority candidates…"[86] Dr. Collingwood concluded by stating that, "PISD school board elections are almost always categorized by patterns of racially

---

[81] *Burns v. Richardson*, 384 U.S. 73, 88 (1966).

[82] *Perez v. Abbott*, 253 F.Supp.3d 864, 942–44 (W.D. Tex. 2017).

[83] *Thornburg v. Gingles*, 478 U.S. 30, 53 n.21 (1986) ("'[R]acial polarization' exists where there is 'a consistent relationship between [the] race of the voter and the way in which the voter votes**,**', or to put it differently, where 'black voters and white voters vote differently. We, too, adopt this definition of 'racial bloc' or 'racially polarized' voting.") (internal citations omitted); *Fabela*, 2012 WL 3135545, at *8 ("[Racially polarized voting] tends to prove that the 'minority group members constitute a politically cohesive unit.'") (internal citations omitted).

[84] *Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1244 (5th Cir. 1988).

[85] *See Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1118 (5th Cir. 1991).

[86] *See*, *e.g.*, Ex. 2 at 2.

polarized voting."[87] Again, Defendant failed to provide an argument that minorities in this case do not vote cohesively; therefore, Defendant cannot succeed on summary judgement.[88]

### ii. The PISD Minorities Preferred Candidates Are Repeatedly Defeated Due to an Anglo Racial Voting Bloc.

To show that a Minority preferred candidates are blocked by a Anglo voting bloc the Plaintiff must show that cohesive voting by the majority is present, and that the cohesive voting by the majority usually defeats the minority preferred candidate.[89] Legally sufficient bloc voting occurs where the bloc is large enough "that [it] normally will defeat the combined strength of minority support plus anglo 'crossover' votes."[90] Texas courts have provided that a voting bloc can be demonstrated through statistical evidence that the majority group impedes the minority group's ability to elect its chosen candidate.[91]

Here, Dr. Collingwood's Analysis concluded that "minority candidates lose in 17 of 18 (*e.g.*, 94%) of contests [she analyzed] which featured at least one minority candidate, which means that Anglo voters typically vote as a bloc to block minority voters from electing their preferred candidates."[92] Dr. Collingwood further stated, that based on his analysis of prior PISD school board elections that "[a]lmost without exception, anglo voters

---

[87] *See*, *e.g.*, Ex. 2 at 20.

[88] *See*, *e.g.*, *Clay*, 934 F.2d at 70 (stating that "if any material facts are disputed, summary judgment is improper, as we will not weigh the evidence or resolve material fact disputes."); *United States Steel Corp. v. Darby*, 516 F.2d 961, 963 (5th Cir. 1975).

[89] *Campos*, 840 F.2d at 1249 (emphasizing that "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting.").

[90] *See Gingles*, 478 U.S. at 51 ("[T]he usual predictability of the majority's success distinguishes structural dilution from the mere loss of an occasional election").

[91] *Lopez v. Abbott*, 339 F. Supp. 3d 589, 609–10 (S.D. Tex. 2018).

[92] *See*, *e.g.*, Ex. 2 at 2.

vote to defeat the minority-preferred candidate—and the minority candidate."[93] Defendant presents no statistical facts or arguments to the contrary and therefore cannot win a summary judgement on this matter.[94]

## B.  The Fifteenth Amendment Prohibits Intentional Vote Dilution.[95]

Defendant claims that the Supreme Court has held that the Fifteenth Amendment does not apply to vote dilution claims.[96] However, the Supreme Court has _not_ decided whether the Fifteenth Amendment applies to vote-dilution claims.[97] Instead, the Supreme Court has long held that the Fifteenth Amendment protects against "diminution as well as the outright denial of the" right to vote.[98] Moreover, the Supreme Court consistently holds that ensuring a right to vote necessarily involves protecting against vote dilution.[99] In fact, for over a 100 years, the Supreme Court has recognized that it is "unquestionable that the right to have one's vote counted is of equal importance to the right to put a ballot in the

---

[93] *See*, *e.g.*, Ex. 2 at 20.

[94] *See*, *e.g.*, *Clay v. Federal Deposit Ins. Corp.*, 934 F.2d at 70; (stating that "if any material facts are disputed, summary judgment is improper, as we will not weigh the evidence or resolve material fact disputes."); *United States Steel Corp. v. Darby*, 516 F.2d 961, 963 (5th Cir. 1975).

[95] Defendants concede that vote dilution claims are cognizable under the fifteenth amendment and fail to produce any evidence that there is not and cannot be proof of discriminatory purpose and discriminatory (or dilutive) effect. *See*, *e.g.*, Mot. at 16 n.12.

[96] Mot. at 16.

[97] *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993); *Jones v. City of Lubbock*, 727 F.2d 364, 370 (5th Cir. 1984) (stating that "the Supreme Court explicitly indicated that the scope of the fifteenth amendment remained an open question"); *Rogers*, 458 U.S. at 618 n.6 (1982) (same); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 n.9 (11th Cir. 1999); *League of United Latin Am. Citizens v. Abbott*, 601 F.Supp.3d 147, 159 (W.D. Tex. May 4, 2022)

[98] *See*, *e.g.*, *Bolden*, 446 U.S. at 126.

[99] *See*, *e.g.*, *id.*

24

box."[100] Supreme Court case precedents, like *Terry*[101] and *Smith*[102], are based upon the understanding that vote dilution is cognizable under the Fifteenth Amendment.[103]

Accordingly, the law strongly cuts towards the applicability of the Fifteenth Amendment to vote dilution claims, like *here*. Indeed, the Supreme Court has opined that there is similarity between the language in Section 2 of the Voting Rights Act and the language of the Fifteenth Amendment.[104] Moreover, the Fifth Circuit and its District Courts have consistently found that vote dilution claims are cognizable under the Fifteenth Amendment in cases like *Uvalde*, *Hall*, *Rogers*, *Jones, Nevett, York,* and *Terrebonne*.[105]

---

[100] *See*, *e.g.*, *United States* v. *Mosley*, 238 U.S. 383, 386 (1915).

[101] *Terry v. Adams*, 345 U.S. 461 (1953).

[102]  *Smith* v. *Allwright*, 321 U.S. 649 (1944).

[103] *See*, *e.g.*, *Bolden*, 446 U.S. at 126 (stating that "[i]ndeed, this Court has explicitly recognized that the Fifteenth Amendment protects against vote dilution.").

[104] *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009) (asserting that Section 2 of the VRA, "tracked, in part, the text of the Fifteenth Amendment. It prohibited practices "imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color."); *compare* 79 Stat. 437; cf. U.S. CONST. Amend. XV ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude"); *Bolden*, 446 U.S. at 60-61.

[105] *See*, *e.g.*, *Hall v. Louisiana*, 108 F. Supp. 3d 419, 439 (M.D. La. 2015) (emphasis added) (asserting that "[f]urther, the Fifth Circuit, amidst a circuit split on this issue, recognizes congruent claims of racially discriminatory ***vote dilution*** under the **Fifteenth Amendment**."); *Rogers*, 458 U.S. at 613 (affirming Fifth Circuit and district court's finding that a county's at-large voting method impermissibly diluted the vote of black residents in violation of, inter alia, their Fifteenth Amendment rights); *Jones v. City of Lubbock*, 727 F.2d at 370–372 (evaluating a Fifteenth Amendment claim under the assumption that it proscribes voting dilution); *Terrebonne Par. N.A.A.C.P. v. Jindal*, No. CIV.A. 14-069-JJB, 2014 WL 3586549, at *7 (M.D. La. July 21, 2014) (stating that "Plaintiffs could bring a vote dilution claim under the Fifteenth Amendment within the Fifth Circuit."); *Nevett*, 571 F.2d at 215 (stating that voting dilution claims are cognizable under the Fifteenth Amendment); *York v. City of St. Gabriel*, 89 F. Supp. 3d 843, 850 (M.D. La. 2015) (stating that "[t]his Court recognizes that a vote dilution claim is also cognizable under the Fifteenth Amendment, with elements mirroring those of a vote dilution claim under the Fourteenth Amendment."); *U.S. v. Uvalde Consol. Indep. Sch. Dist.*, 625 F.2d 547, 552 (5th Cir. 1980) (asserting that Fifth Circuit "precedent recognizes that at-large districting may result in substantial dilution of a minority vote and therefore constitute unconstitutional infringement of the right to vote if discriminatory purpose is shown.").

Various other Circuits and their District Courts have as well. For instance, the Third Circuit[106], Fourth Circuit[107], and Eighth Circuit[108].

Defendant misapplies *Prejean* as definitively stating that a vote dilution claim is not cognizable under the Fifteenth Amendment in the Fifth Circuit.[109] In actuality, the panel in *Prejean* does not even address whether the Fifteenth Amendment applies to vote dilution claims because it was deciding whether sub-districting for state judicial elections was done for predominately racial reasons.[110] Accordingly, *Prejean*'s dicta that the Supreme Court has rejected the application of the Fifteenth Amendment to vote dilution claims is not a definitive pronouncement of the Fifth Circuit's opinion.[111] Instead, *Prejean* simply stands for the Fifth Circuit's recognition of the fact that the jurisprudence makes it difficult to succeed on a vote dilution claim under the Fifteenth Amendment.[112]

Defendant misrepresents *Lopez*. In such case, the Southern District of Texas held that, as law existed in 2009, proving a 14th and 15th Amendment claim required a showing of purpose and effect to dilute minority voting strength; whereas, Section 2 of the Voting

---

[106] *See*, *e.g.*, *Page*, 248 F.3d at 193 n.12 (establishing that vote dilution claims are viable under both the Fourteenth and Fifteenth Amendment and the Supreme Court's reservation to opine on the Fifteenth Amendment's applicability to vote dilution claims does not foreclose their viability as a matter of law).

[107] *See*, *e.g.*, *Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981) ("Claims of racially discriminatory vote dilution exist under both the fifteenth amendment and the Equal Protection Clause of the fourteenth amendment.").

[108] *See*, *e.g.*, *Perkins v. City of West Helena*, 675 F.2d 201, 205 (8th Cir. 1982) (establishing that claims of racially discriminatory vote dilution are cognizable under the Fifteenth Amendment.).

[109] *See*, *e.g.*, *Terrebonne Par. N.A.A.C.P. v. Jindal*, No. CIV.A. 14-069-JJB, 2014 WL 3586549, at *7 (M.D. La. July 21, 2014).

[110] *See*, *e.g.*, *Prejean v. Foster*, 227 F.3d 504, 518 (5th Cir. 2000).

[111] *See*, *e.g.*, *Terrebonne Par. N.A.A.C.P. v. Jindal*, No. CIV.A. 14-069-JJB, 2014 WL 3586549, at *7 (M.D. La. July 21, 2014).

[112] *See*, *e.g.*, *id.*

26

Rights Act only requires plaintiff show discriminatory effect.[113] Accordingly, if a plaintiff could not show discriminatory effect necessary for the purposes of Section 2 of the Voting Rights Act, then a plaintiff could not show both purpose and effect for the purposes of the 14th and 15th Amendment claim. Here, the record contains a voluminous amount of evidence of both purpose and effect to dilute minority voting strength in PISD, which Defendant does not even dispute in its motion.

Moreover, Defendant omits the key fact that coalition claims where not at issue in *Lopez* and the Court specifically stated "the court was unable to identify, any decision in which a court actually held that a vote dilution claim under the Equal Protection Clause and/or the Fifteenth Amendment cannot succeed, as a matter of law, if the plaintiffs are unable to establish a violation of § 2's 'less rigorous' standard."[114] Accordingly, the Court should ignore Defendant's conflation that *Petteway* somehow impacts the efficacy of Plaintiffs' 14 and 15th Amendment claims, as *Lopez* and *Petteway expressly* rejects such position.

Ultimately, the Fifteenth Amendment firmly prohibits vote dilution when a party, like PISD, has a discriminatory purpose and a discriminatory effect in maintaining an at-large voting system.[115] The difficulty of the standard does not make this issue ripe for

---

[113] *See*, *e.g.*, *Lopez v. City of Houston*, No. CIV. A. H-09-0420, 2009 WL 1456487, at *17 (S.D. Tex. May 22, 2009), aff'd, 617 F.3d 336 (5th Cir. 2010).

[114] *Id.*

[115] *See*, *e.g.*, *Voter Information Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 212 (5th Cir. 1980) (stating that "[t]o obtain relief on a vote dilution claim such as this under the Fourteenth and Fifteenth Amendments the plaintiffs must "prove that the purpose and operative effect" of the challenged election scheme "is to dilute the voting strength of [minority] citizens."); To obtain relief on a vote dilution claim such as this under the Fourteenth and Fifteenth Amendments the plaintiffs must "prove that the purpose and operative effect" of the challenged election scheme "is to dilute the voting strength of [minority] citizens."); *Lopez*, 2009 WL 1456487, at *17.

summary adjudication especially considering the voluminous evidentiary record laying out the discriminatory purpose and discriminatory effect of the at-large voting system in PISD.

## C.  Fifth Circuit's *Petteway* Decision is not Applicable to Plaintiff's Case.

As stated by Defendant, *Petteway* concerned several plaintiffs challenging the county's redistricting plan for county commissioner elections.[116] Here, Plaintiffs are challenging the at-large voting system in place in Pearland ISD. In other words, the factual backdrop of the case is starkly different, which allows the cases to be distinguished.

In fact, *Petteway* involved a County, and this case involves an Independent School District. Moreover, *Petteway* involved a County Commissioner Election, whereas this case involves a Board of Trustee election. Lastly, *Petteway* involved a coalition of African American and Hispanic voters, whereas this case involves a coalition of Hispanic and Asian voters. Put differently, this Court is under no duty to follow *Petteway* to the extent this Case has small variations and nuances of fact, which the record bears out.[117]

From a legal backdrop perspective, the same issue exists. Defendant advocates that *Petteway* establishes that Plaintiffs' Fourteenth and Fifteenth Amendment claims are not viable.[118] However, Petteway is expressly limited to claims brought under the Voting Rights Act and *Petteway* expressly allowed Fourteenth and Fifteenth Amendment claims

---

[116] *See*, *e.g.*, *Petteway v. Galveston Cnty.*, 111 F.4th 596 (5th Cir. 2024).

[117] *See*, *e.g.*, *Roane v. Callisburg Independent School Dist*, 511 F.2d 633, 636 (5th Cir. 1975) (stating that "[s]mall variations and nuances of fact may distinguish present cases from established precedent."); *Kreipke v. Commissioner of Internal Revenue*, 32 F.2d 594, 595 (8th Cir. 1929) (asserting that "difficult questions arise under the application of any precedent to varied circumstances, and fine shades of distinction often are determinative of the question").

[118] Mot. at *passim*.

to proceed.[119] Accordingly, Defendant's apparent over application of Petteway should be ignored.

### D. Summary Judgment is Not Appropriate at this Stage, as More Discovery is Required.

Generally, Federal Rule of Civil Procedure 56(d) broadly favors additional discovery to safeguard non-movants from summary judgment motions, like *here*, that cannot be fully opposed due to outstanding discovery.[120] In general, Rule 56(d) requests are "broadly favored and . . . liberally granted."[121] In fact, "a continuance of a motion for summary judgment for the purposes of discovery should be granted almost as a matter of course" when the party opposing summary judgment can show that it used diligent efforts to obtain evidence from the moving party, but those efforts had been unsuccessful.[122] Based on this forgiving standard, Rule 56(d) would allow a continuance in this case.

Here, Plaintiffs utilized diligent efforts to obtain discovery, but at no fault of their own have been unable to do so. Because of the stay on discovery lasting from January 2024 to August 2024, Plaintiffs have not been able to depose both factual witnesses to uncover more express instances of intentionally discriminatory actions taken by PISD officials. Based on the statements put forth by the city council members, Plaintiffs believe that further discovery would yield even more evidence of PISD's underlying discriminatory purpose for utilizing the at-large voting system. Plaintiffs have also not been able to receive

---

[119] *See, e.g., Petteway v. Galveston Cnty.*, 111 F.4th 596 (5th Cir. 2024).

[120] *See, e.g., Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 893 (5th Cir. 2013); *see also Parakkavetty v. Indus Intern., Inc.*, 2004 WL 354317 (N.D. Tex. Feb. 12, 2004) ("[Rule 56(d)] is an essential ingredient of the federal summary judgment scheme and provides a mechanism for dealing with the problem of premature summary judgment motions.").

[121] *Dominick v. Mayorkas*, 52 F.4th 992, 995 (5th Cir. 2022)

[122] *Id.*

29

responses to multiple interrogatory and production requests. This additional evidence would demonstrate genuine issues of material fact, as Defendant still claims that there are no underlying discriminatory purposes behind its' utilization of the at-large voting scheme. This evidence is essential to Plaintiffs' opposition of Defendants' motion, and therefore, until Plaintiffs have this opportunity for discovery, Defendant's motion is premature.

## V.
## <u>CONCLUSION</u>

Accordingly, Plaintiffs request that the Court deny Defendant's Motion for Summary Judgment and grant Plaintiffs all such other appropriate relief.

Dated: October 17, 2024                Respectfully submitted,

                                       **BREWER STOREFRONT, PLLC**

                          By:    */s/ Joshua H. Harris*
                                 William A. Brewer III
                                 Attorney-in-Charge
                                 State Bar No. 02967035
                                 Southern District of Texas Bar No. 92835
                                 wab@brewerattorneys.com
                                 Malvina Palloj (pro hac vice)
                                 Of Counsel
                                 NY State Bar No. 5980198
                                 mdp1@brewerattorneys.com
                                 Joshua H. Harris
                                 State Bar No. 24127306
                                 Southern District of Texas Bar No. 3635014
                                 jkh@brewerattorneys.com
                                 1717 Main Street, Suite 5900
                                 Dallas, Texas 75201
                                 Telephone: (214) 653-4000
                                 Facsimile: (214) 653-1015

                                 **ATTORNEYS FOR PLAINTIFFS**

30

## CERTIFICATE OF SERVICE

In accordance with the Federal Rules of Civil Procedure, I hereby certify that a true and correct copy of the foregoing document was electronically served upon all counsel of record on October 17, 2024.

*/s/Joshua H. Harris*
Joshua H. Harris